**In the Matter of HMH MOTOR SERVICES, INC., Debtor.**

**Anne Moore, Chapter 7 Trustee, Plaintiff,**

**v.**

**Linda B. Brewer, Defendant.**

**Bankruptcy No. 89–20232. Adversary No. 97–2054.**

United States Bankruptcy Court, S.D. Georgia, Brunswick Division.

Sept. 18, 2000.

442

William Orange, Donald Napier, Brunswick, Georgia, for plaintiff.

Jerome Kaplan, Ronald Thomason, Macon, Georgia, for defendant.

Anne Moore, Statesboro, Georgia, for trustee.

---

1. Brewer believed that Enterprises had been incorporated, but it was not. When this fact was discovered in 1996, Brewer attempted to incorporate Enterprises, but that name had

## MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

### FINDINGS OF FACT

HMH Motor Services, Inc. ("Motor Services") filed a petition for relief under Chapter 11 of Title 11 U.S.Code on April 28, 1989. Prior to confirmation of the plan, the case was converted to a Chapter 7 liquidation on December 9, 1996, and Plaintiff was appointed Trustee to liquidate the assets of Debtor. She brings this action seeking to recover post-petition payments by Motor Services to or for the benefit of Linda Brewer, d/b/a Brewer Leasing Company, a proprietorship.

Motor Services was at all relevant times a Georgia corporation, all of the stock of which was owned by Larry C. Brewer who served as president and chief executive officer during the pendency of the case.

Linda B. Brewer, Defendant herein, is the wife of Larry C. Brewer and is and was, during the pendency of the bankruptcy case, an "insider" as defined under 11 U.S.C. § 101(31)(B)(vi).

In 1967 Linda Brewer began operating a sole proprietorship known as Brewer Leasing Company. Brewer Leasing Company was in the business of purchasing tractors and trailers which it leased or rented to other entities including entities controlled by Larry Brewer. These included HMH Enterprises, a sole proprietorship of Larry Brewer[1], and B & H Direct Delivery, Inc., a corporation wholly owned by Larry Brewer. Motor Services began leasing vehicles from Brewer Leasing Company in 1983. Prior to that time Brewer Leasing Company had leased vehicles to other entities, but its dealings with non-affiliated businesses ceased beginning in 1983 when Larry Brewer purchased HMH Motor Services. Therefore, at the time Motor Services filed Chapter 11 in

already been assigned to another unrelated company, and he was forced to select another name, HMH Transportation, which was formed in 1997.

1989, it and the other Brewer entities were the sole customers of Brewer Leasing Company and continued to be so until the date of the Chapter 7 conversion.

At no time in Debtor's Schedules or Disclosure Statements was the existence of lease arrangements between Motor Services and Brewer Leasing Company revealed. At all times, Larry Brewer had full ownership and control of Motor Services, HMH Enterprises, and B & H. He also made all decisions for and on behalf of Linda Brewer, d/b/a Brewer Leasing Company, inasmuch as Linda Brewer is a full-time employee of the State of Georgia and does not operate Brewer Leasing Company in any meaningful sense.

Ostensibly separate entities were utilized by Larry Brewer, in part, because the nature of their business differed. Motor Services was a certificated over-the-road common carrier. HMH Enterprises operated off the road spotter services—moving and placing trailers on private terminals of its clients, notably K–Mart. B & H performed similar work and also authorized independent driver-operators to haul loads, utilizing its ICC Certificate. Despite their "separate" entity status, Larry Brewer merged these business interests. The fact that HMH Enterprises, B & H, or Brewer Leasing Company existed separately was never revealed in Debtor's Schedules filed in this Court or in its Disclosure Statements.[2] Although HMH Enterprises allegedly operated as a separate entity, Larry Brewer commingled the revenues of all the entities. He acknowledged that he never maintained separate bank accounts for them. All the dollars received by HMH Enterprises flowed to Motor Services and the operating reports filed throughout the pendency of this case all included monies earned by HMH Enterprises.

During the calendar year 1995 and 1996, Motor Services "leased" various vehicles and pieces of equipment from Brewer Leasing Company. There are and were no written instruments evidencing any of

2. Motor Services listed 5240 Old Dixie Highway, Forest Park, Georgia, as a location from which Motor Services conducted business without revealing that HMH Enterprises operated from that location as Mr. Brewer now contends. Statement of Affairs, question 17, required Motor Services to reveal the existence and terms of any lease of business property and it revealed a lease in California from Paul Driskell Properties, but did not reveal the existence of any lease of real estate or vehicles from Linda Brewer. The answer to question 17 also revealed a lease with Larry Brewer over property in Hazlehurst and a lease with Larry Brewer over property in Forest Park, but again did not show the existence of any lease with Linda Brewer. In Schedule B–2 Motor Services revealed $4.4 million in automobiles, trucks, trailers, and other vehicles and attached an Exhibit "C" running 41 pages in length identifying by make, model, and serial number, all the tractors and trailers owned by Motor Services which it claimed as assets at the outset of the case. In none of these Schedules does it show that Motor Services' interest was anything other than full ownership. In other words, none of them were shown as being leased vehicles. Under Schedule B–2(M), Tangible Personal Property of any other Description, Motor Services did not show its leasehold interest in any vehicles leased from Brewer Leasing Company nor were any leasehold rights shown in Schedule B–2(N) under general intangibles.

Motor Services' Disclosure Statement filed November 6, 1989, listed creditor 14, Strick Lease, Inc., as a pure lease on various trailers. It showed creditors Strick Lease, Inc., and Trailer Rental Company, creditor number 16, as trailer rental and trailer lease creditors, but never revealed any existence of any leases or any creditor status of Linda Brewer or Brewer Leasing Company. The Disclosure Statement made no mention of any lease arrangements with Linda Brewer or Brewer Leasing Company nor any mention of the related Brewer entities such as HMH Enterprises. The Amended Disclosure Statement filed September 12, 1991, showed under secured creditors Avco Leasing, Enterprise Leasing, Don Kott Leasing, Strick Lease, Inc., and Trailer Rental Company, all of which leased tractors, trailers, or other business assets to Motor Services, and yet never was there any disclosure of lease arrangements as to tractors or trailers with Linda Brewer or Brewer Leasing Company. The Amended Disclosure Statement again failed to disclose the operation of HMH Enterprises or any other related businesses under common ownership of Mr. and Mrs. Brewer.

the terms of the lease agreements between Motor Services and Brewer Leasing Company. Motor Services did not seek Bankruptcy Court approval to assume any existing pre-petition leases or to enter into any new lease agreements with Brewer Leasing Company. As described, these leases were "Triple Net" leases. The "terms" of the oral leases were that Motor Services would pay directly or on behalf of Brewer Leasing Company the monthly debt service payments owed by Brewer Leasing Company and other expenses such as repair, maintenance, and insurance, plus some profit to Linda Brewer.

"Terms" is a rather loose term as used in this Order because there never was any real meeting of the minds as between Larry Brewer and Linda Brewer. She relied on him to make all decisions on behalf of all related entities, including Brewer Leasing Company. He, in turn, just did as he pleased. There was no evidence that these "terms" were normal and customary in the industry, that the amounts paid by Motor Services were reasonable in amount, how much was paid on any given piece of equipment, how much it was used, how much revenue it generated for Motor Services, and whether the value of the equipment owned by Brewer Leasing Company was exceeded by the payments made by Motor Services.

While Larry Brewer testified, and I find, that leasing equipment is an ordinary business practice in the trucking industry, there was no evidence to establish how much was paid to or on behalf of Brewer Leasing Company by Motor Services. At least in part as a result of the leases by Motor Services which paid the debt service obligations of Brewer Leasing Company on approximately 30 vehicles, Brewer

Leasing now has unencumbered title to all those vehicles.

Linda B. Brewer is a co-borrower on a promissory note numbered 37340 in favor of Southeastern Bank, evidenced by a note dated June 1, 1993 (Exh. P–8). This note evidenced a line of credit extended to Linda Brewer and Larry Brewer which they utilized to assist all the various Brewer entities in funding their cash operational needs. Collateral for the loan included Linda Brewer's real estate and a certificate of deposit, but *no* assignment of accounts receivable or other assets of Motor Services was executed at the outset. Later, Motor Services executed a UCC financing statement pledging its accounts receivable to Southeastern Bank which financing statement was filed on February 18, 1994 (Exh. D–123). However, Motor Services never obtained Court permission to execute its guarantee of the pre-existing debt of Mr. and Mrs. Brewer. Therefore, while Mr. Brewer, as president of Motor Services, did execute a guarantee on behalf of the company of the line of credit he and Mrs. Brewer previously obtained individually, that action was never authorized by this Court as required by 11 U.S.C. § 364(c).[3]

During calendar year 1995, Motor Services, or other Brewer entities, paid to, or on behalf of Brewer Leasing Company, the sum of $152,000.00. (Exh. P–1, Sch. C, line 1). This amount was shown as income to Brewer Leasing Company on Larry and Linda Brewer's 1995 personal income tax return. The Trustee stipulated that she cannot recover any transfers made prior to July 3, 1995. There was no evidence offered by either the Trustee or Defendant to establish when during 1995 the $152,000.00 payments were made. During the calendar year 1996, HMH Enterprises

3. 11 U.S.C. Section 364(c) provides:
  (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
  (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
  (3) secured by a junior lien on property of the estate that is subject to a lien.

reported paying the sum of $252,000.00 for vehicle leases, which was paid to or on behalf of Brewer Leasing Company. (Exh. P–2, HMH Enterprises., Sch. C, line 20a). These sums represent payments on the "leases" of equipment by Brewer Leasing to all the Brewer companies. There is no breakdown to show how much of the equipment was used by HMH Enterprises and how much by Motor Services.

In contrast to the information shown on the tax returns, the figures reported to this Court differed. Motor Services filed monthly operating reports with the Office of the United States Trustee as required by law during the pendency of its Chapter 11 case. From July 1, 1995, through August 31, 1996, the last monthly report filed prior to the conversion of the case to Chapter 7, the operating reports were admitted as Plaintiff's Exhibits 47–60. A summary of those exhibits was admitted as P–Summary # 1 and reveals that for the period from July 1, 1995, through August 31, 1996, the advances on the line of credit made by Southeastern Bank for the benefit of Motor Services totaled $5,086,728.19. (Exh. P–Summary 1). Exhibit P–Summary # 2 reveals that repayments were made on the line of credit by Motor Services which directly benefitted Linda Brewer, d/b/a/ Brewer Leasing Company,

in the amount of $5,110,297.67, or a net excess payment by Motor Services for the direct benefit of Linda Brewer of $23,569.48 for the relevant period of time. (Exh. P–Summary 2). During the 1996 calendar year, $28,376.69 was deposited by Motor Services into the Brewer Leasing Company bank account. (Exh. D–2, p. 23). There were no offsetting disbursements made to benefit Motor Services from the Brewer Leasing bank account during 1996. (Exh. D–2 p. 92). In addition, Motor Services made direct trailer loan payments to Allstar of $24,668.69 and Great Dane of $10,307.52. Taking all the transactions together, $86,922.38 was paid by Motor Services for the benefit of Brewer Leasing Company during the relevant time frame. The contradiction in reports made by Motor Services to the Court in its monthly operating reports and its income tax returns is both bewildering and confusing.[4]

Linda Brewer owns the building that all the various Brewer enterprise companies occupied. She entered into a lease agreement with Motor Services to rent the real estate which Motor Services used during the pending bankruptcy case. Rental payments were sporadic, and there was no evidence to establish the precise amount of real estate rentals paid by Motor Services

---

4. This number is substantially lower than the sum of payments revealed on the tax returns. According to the testimony of the company's CPA, however, the 1996 lease expense of $252,000.00 paid by HMH Enterprises was a pro forma figure "pulled out of the air" in order to avoid the consequence of Mr. Brewer owing additional Social Security taxes as a self-employed person. The Court did not fully fathom why, and need not draw any legal conclusions as to why, it was necessary for these funds to be reported to the IRS as shown on the return. The CPA also testified that *in toto* Mr. and Mrs. Brewer's income tax return for 1996 was accurate in that all income of all of their enterprises was accounted for and all expenses were accounted for. The pro forma numbers, however, were allocated among their enterprises without any specific backup. All of this serves as further evidence that the Brewers merged and commingled all of their ostensibly separate enterprises into a single operating company.

The CPA also testified that the operating reports on file with the Court were an accurate reflection of actual cash receipts and disbursements. He was not hired to perform an audit of the company, nor to set up the internal accounting of the companies, but rather to prepare returns from the best information available as maintained by Mr. and Mrs. Brewer, the Debtor corporation, and their affiliated companies. He concluded, and the Court agrees, that their books and records were "a mess."

The tax returns would form a basis for awarding the Trustee the sums reflected on the return under the doctrine of judicial estoppel. *See infra* at 13. However, because the CPA testified, credibly, that the reports filed in this Court were correct, and that the tax returns in their entirety were correct, I decline to do so.

to Linda Brewer. She owes a mortgage to Baxley Federal and that mortgage was paid by one of the various Brewer companies, but she is not sure which entity, and is not sure of the amount that was paid. Schedule "E" on the 1996 tax return shows that Mr. and Mrs. Brewer reported rents received on a commercial building in the amount of $41,128.00 (Exh. P–2, HMH Enterprises, Sch. E). However, there was no evidence to show whether this is the same building or in fact if the payments in this amount were made by Motor Services.

At the time that Motor Services filed its last monthly operating report prior to its conversion to Chapter 7 it showed accounts receivable in an amount in excess of $600,000.00 due and owing to the company. (Exh. P–60).

Following conversion of Motor Services from Chapter 11 to Chapter 7, from and including December 24, 1996, until May 29, 1997, one hundred and twenty-four (124) separate checks made payable to the Debtor, HMH Motor Services, Inc., totaling $255,287.56 were endorsed by Larry C. Brewer, as president of HMH Motor Services, Inc. (Exh. P–45). They were then deposited directly into Southeastern Bank for payment to and debt reduction on account 37340 directly benefitting Linda Brewer. Larry Brewer contends that the services for which these payments were received were actually rendered by HMH Enterprises, not Motor Services. However, there was no other evidence to establish that these sums were not proceeds of pre-conversion accounts receivable or that Motor Services did not, in fact, simply continue, post-conversion, to do business and bill its customers.

The notion that the services were rendered by HMH Enterprises and not Motor Services is pure fantasy. After conversion, Motor Services' customers continued to receive service with the same equipment, from the same employees, emanating from the same location, using the same telephone number as before the conversion. The only thing that changed was that employees began to answer the phone with the name "Enterprises." Numerous bills were rendered in Motor Services' name and checks in payment for those services were written to Motor Services. Larry Brewer elected to use the proceeds to pay down the debt of Linda Brewer, not to apply the proceeds to Motor Services' debt nor to account to the Trustee for these funds or for his use of Motor Services' corporate assets—leased vehicles, name, goodwill, customer list, etc.

It was stipulated that Defendant's Exhibit 136 correctly shows total receipts of $211,332.64 received by Motor Services post-conversion with backup documentation showing that the services were either invoiced by Motor Services or that the checks were made payable to Motor Services by pre-conversion customers of Motor Services. It was further stipulated that Defendant's Exhibit 138 shows additional receipts in the amount of $46,071.31 which were payable to Motor Services from pre-existing customers of Motor Services, but without any backup documentation to show by whom the services were rendered or by whom they were billed. The Trustee contends she is entitled to recover the total of those two sums less a credit of approximately $3,200.00 for a net recovery of $255,314.96 [5].

Finally, it was stipulated that Defendant's Exhibit 139 represents payments received for spotter services in the amount of $56,300.43.

Brewer argues that at most the $255,314.96 less $46,071.31, less $56,300.43

---

5. The figures do not match. The $255,314.96 figure claimed by the Trustee does not equal the $255,287.56 amount discussed *supra* and reflected in Exhibit P–45 (which is the total amount of the 124 checks payable to Debtor Motor Services received post-conversion, endorsed by Larry Brewer, and paid down on the line of credit of Linda B. Brewer). Because the parties stipulated to the admission of the Exhibits, I adopt the stipulated sum of $255,287.56 from Exhibit P–45.

should be the limit on the recovery because that is the maximum amount which could be deemed "earned" by Motor Services, but which was paid over to the direct benefit of Brewer Leasing Company. The Trustee argues that the entire $255,314.96 is recoverable either because it was earned by Motor Services and diverted for the benefit of Brewer Leasing Company, or because Larry Brewer diverted Motor Services' business to HMH Enterprises and its earnings subsequently were paid to benefit Brewer Leasing Company.

Larry Brewer contends that HMH Enterprises was actively engaged in spotter services prior to the Fall of 1996 and that $56,300.43 should be excluded from any recovery by the Trustee because it represents income properly attributed to HMH Enterprises, not the Debtor. However, he previously testified that HMH Enterprises was not actively engaged in business prior to the Fall of 1996 with the exception of one tractor doing nominal business. (Exh. P–61, p. 100). I therefore find that the funds received for spotter services were earned by Debtor Motor Services.

Larry Brewer also testified that Motor Services had historically performed both over-the-road and spotter services. He testified that HMH Enterprises had simply picked up the over-the-road business after conversion of Motor Services thus "earning" the $46,071.31 in post-conversion over-the-road income which was not linked by any document directly to Motor Services. (Exh. D–138). That testimony was contradicted and impeached, however, by Mr. Brewer's testimony at earlier stages in this case to the effect that HMH Enterprises had done no over-the-road hauling of freight prior to February of 1997 (Exh. P–61, p. 79) and his further testimony that monies received by HMH Enterprises had not originated from accounts previously serviced by Motor Services (Exh. P–61, p. 57). I find his earlier testimony to be credible and his testimony at the trial of this case to be lacking in credibility.

Alternatively, I find that he should be estopped from now taking a contradictory position under the doctrine of judicial estoppel. *See Hardy v. Hardy,* No. 496–274, slip op. at 9 (S.D.Ga. Oct. 6, 1997). "This doctrine 'prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken by him in the same or some earlier legal proceeding' . . . Generally, the doctrine applies to prevent a party from contradicting his own sworn statements." *U.S. v. McCaskey,* 9 F.3d 368, 378 (5th Cir.1993), *cert. denied,* 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994) (citing Rand G. Boyers, Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel,* 80 Nw. U.L.Rev. 1244, 1244 (1986) and *Brandon v. Interfirst Corp.,* 858 F.2d 266, 268 (5th Cir.1988)).

Debtor Motor Services never sought permission of the Bankruptcy Court to transfer these funds to the benefit of Linda B. Brewer or Brewer Leasing Company and none of the transfers were authorized by the Bankruptcy. Court. All of the transfers complained of made by Motor Services to or on behalf of Brewer Leasing Company or Linda B. Brewer were made after the commencement of the case. All of the transfers complained of made by Motor Services to or on behalf of Brewer Leasing Company or Linda B. Brewer were property of the estate.

### CONCLUSIONS OF LAW

11 U.S.C. Section 549(a) provides:

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2) (B) that is not authorized under this title or by the court.

11 U.S.C. Section 550(a) provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 549 . . . of this

title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

I hold that the Trustee has made a *prima facie* case for recovery of substantial sums of money on account of the post-petition transfers enumerated in this Order. The funds were property of the estate, transferred post-petition without court order. Linda Brewer, d/b/a Brewer Leasing Company, was the recipient of those transfers and is liable under Section 550 for the return of the funds to the Chapter 7 Trustee unless she establishes a defense.

### I. The Pre–Conversion Payments

■ These payments made to or for the benefit of Linda Brewer were paid post-petition and prior to conversion to Chapter 7. Debtor Motor Services, while in Chapter 11, drew down on a line of credit arranged by Linda Brewer on which Motor Services was not liable, and repaid more than the amounts received by the sum of $23,569.48 from July 1, 1995 through August 31, 1996. (Exh. P–Summary 2). During 1996, Motor Services also deposited $28,376.69 into the Brewer Leasing bank account without receiving the benefit of any disbursements from that account. (Exh. D–2, pp. 23 and 92). Motor Services also made direct loan payments for which Linda Brewer was liable of $34,976.21.[6] These pre-conversion payments total $86,922.38.

11 U.S.C. Section 541(a) provides in relevant part:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

The source of these pre-conversion payments was post-petition earnings of the Debtor, Motor Services, which are property of the estate pursuant to Sections 541(a)(6) and (7). They were not authorized by any court order and are therefore voidable under § 549 unless Linda Brewer establishes a defense as is her burden under Bankruptcy Rule 6001.

Linda Brewer asserts as a defense to this claim the ordinary course of business "safe harbor" of 11 U.S.C. § 363(c)(1) which provides:

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

■ The Bankruptcy Code does not define "ordinary course of business." "The 'ordinary course of business' standard is intended to allow a debtor 'the flexibility it needs to run its business and respond quickly to changes in the business climate'... At the same time, it protects

---

**6.** This figure is the sum of direct trailer loan payments made to Allstar of $24,668.69 and Great Dane of $10,307.52 as outlined in the findings of fact.

creditors from dissipation of the estate's assets." *Habinger, Inc. v. Metropolitan Cosmetic and Reconstructive Surgical Clinic, P.A.,* 124 B.R. 784, 786 (D.Minn. 1990) (citations omitted). "[T]he authorization in § 363 that the trustee may use property of the estate in the 'ordinary course of business' without notice or a hearing cannot be construed to permit payments that frustrate the theory and philosophy of the Bankruptcy Code." *U.S. ex rel. Harrison v. Estate of Deutscher (In re H & S Transp. Co., Inc.),* 115 B.R. 592, 599 (M.D.Tenn.1990) (citations omitted). I hold that she has failed to establish this defense.

■ Courts have developed two complementary tests, known as the horizontal and vertical tests, which provide a framework in analyzing whether a transaction falls in the "ordinary course of business." If the transaction fails to meet the requirements of either test, then it cannot be considered in the "ordinary course of business." *See Burlington Northern Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700 (9th Cir.1988) (postpetition lease transactions were found to be within the ordinary course of debtor-in-possession's business under § 549(a) because both the horizontal and vertical dimension tests were met); *See also In re Media Central, Inc.,* 115 B.R. 119 (Bankr. E.D.Tenn.1990) (post-petition severance pay contracts between debtor and members of its management team failed the vertical/creditor expectation test and were not in the debtor's ordinary course of business).

■ The first line of factual inquiry, known as the horizontal test, is "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *In re Roth American, Inc.,* 975 F.2d 949, 953 (3rd Cir.1992) (citation omitted). It compares the transaction against the typical transactions of like businesses. "[T]he test is whether the post petition transaction is of a type that other similar businesses would engage in as ordinary business." *Habinger, Inc. v. Metropolitan Cosmetic,* 124 B.R. at 786, citing *Dant & Russell, Inc.,* 853 F.2d at 704. As part of the ordinary course of business defense, Defendant asserts that these pre-conversion payments made to or for the benefit of Linda B. Brewer or Brewer Leasing Company cannot be set aside because all the payments, in the aggregate, represent the rental value of equipment provided by Brewer Leasing Company to Motor Services. While there was evidence that equipment leasing is in fact common in the trucking industry, there was no evidence that the "business practices of Motor Services' competitors," and in particular equipment leases, were comparable to the business practices of Motor Services and Brewer Leasing Company. 2 *Norton Bankr.L. & Prac.2d* § 37.3 (2000). There was no evidence of what period of time the leases covered, the payment amount, the profit margin built into compensate Linda Brewer as lessor, or the purchase options, if any, retained by Motor Services. There was no evidence that the terms, rate of payment, interest factor or any other element of the leases matched those typical in the industry. These pre-conversion payments thus failed to meet the horizontal test.

■ Nor did they meet the so-called vertical test, i.e., did the leases conform to the reasonable expectations of a hypothetical creditor of Motor Services. *In re Roth American, Inc.,* 975 F.2d at 953. This approach focuses on the creditor's expectation by viewing the transaction from the creditor's perspective and inquires whether the creditor would expect notice and hearing on the transaction. *In re Media Central, Inc.,* 115 B.R. at 123. "The touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *Armstrong World Industries, Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.),* 29 B.R. 391, 394

(S.D.N.Y.1983). Defendant Linda Brewer argues that these transactions were within the ordinary course of the business because the leases and pre-conversion payments were an established practice of the Debtor's business and there was nothing different which occurred post-petition that would require creditors to receive notice and a hearing. This Court disagrees. While such payments and transactions may have been the regular practice of the Brewer-controlled entities, the Court does not find that such practice makes them ordinary from the perspective of a hypothetical creditor's vantage point. In this case, the nature of the leases and other pre-conversion payments remove them from the scope of "ordinary course of business." First, these pre-conversion payments, which came from the Debtor's post-petition earnings, were not made solely for the Debtor's benefit, but also benefitted Brewer Leasing Company and/or Linda Brewer, an insider. *See Johnston v. First Street Companies (In re Waterfront Companies, Inc.),* 56 B.R. 31 (Bankr.D. Minn.1985)(holding that an indemnity and hold harmless agreement, which was for the benefit of a separate business in which the principal of the debtor had an interest, was not in the ordinary course of business because it failed the vertical dimension test). Second, the failure of proof of exact terms and lack of any evidence to show that, objectively, Motor Services was paying what would be expected in the industry dooms the defense. Creditor expectations would certainly be violated by a debtor's transaction at rates unfavorable on an industry-wide scale. Finally, the leases:

(1) Were concealed from disclosure by Motor Service's failure to reveal them in the Petition, Schedules, Statement of Affairs, and Disclosure Statements;

(2) Were never the subject of independent investigation or inquiry at a time when the fairness of the leases could have been most meaningfully analyzed;

(3) Were between insiders and thus were not in any sense arms-length in nature; and

(4) Were totally determined by Larry Brewer, the CEO of Motor Services and husband of the Lessor, who then had obvious conflicting motivations in managing these assets.

I hold that no hypothetical creditor would reasonably expect a Debtor-in-possession with fiduciary duties to conceal the existence and substance of transactions involving hundreds of thousands of dollars and scores of estate assets from the Court, the United States Trustee, and the creditor body, especially when they were conducted with an insider. I find that these pre-conversion payments and lease transactions fail both the horizontal and vertical dimension tests and were not made in the ordinary course of business. Therefore, notice, a hearing, and Court approval were mandatory pre-requisites to the transfer of any funds by Debtor Motor Services post-petition to Linda Brewer/Brewer Leasing Company. Accordingly, I hold that the proven post-petition, pre-conversion, payments totaling $86,922.38 are recoverable by the Trustee.

## II. The Office Lease

The office lease payments, in the amount of $41,128.00 as reflected in the Brewer's 1996 tax returns for rents received on a commercial building (Exh. P–2, HMH Enterprises, Sch. E), would likely fall in the same category as equipment lease payments but for the fact that the Trustee was unable to establish the precise amount paid by Motor Services to Linda Brewer as noted *supra* at 9 in the Findings of Fact. Nor was the Trustee able to establish that all commercial rental income shown on the Brewers' tax return or Schedules was paid by Motor Services. The deplorable condition of Motor Services' books and records may have contributed to the failure of proof of this point— or the Brewers may have leased commer-

cial property to some party other than Motor Services. In any event, this claim was not established.

### III. The Post–Conversion Payments

■ These payments, consisting of the 124 checks made payable to Debtor HMH Motor Services, Inc. totaling $255,287.56, are recoverable by the Trustee. (Exhibit P–45). Section 549(a) has four criteria for avoidance: (1) a transfer; (2) of property of the estate; (3) which occurred post-petition; and (4) was not authorized by the Bankruptcy Code or the court. *Manuel v. Allen (In re Allen)*, 217 B.R. 952, 955 (Bankr.M.D.Fla.1998). Under Section 549 these sums were transferred after the commencement of the case and were not authorized by the Code or by any Court order. The sole issue is whether these sums were property of the estate.

■ Defendant argues that these funds were not property of the estate because they were payment for services rendered by HMH Enterprises, another Larry Brewer-controlled entity, not Debtor Motor Services. Debtor, HMH Motor Services, ceased operations in October 1996, which was two months prior to conversion to Chapter 7 on December 9, 1996.[7] Defendant therefore asserts that these checks are not property of the bankruptcy estate because on the dates the checks were issued, the case had already been converted from Chapter 11 to Chapter 7 and there remained no Debtor-in-possession. The Trustee argues that the checks are property of the estate because they were proceeds of contracts or other assets of Motor Services, which constitute property of the estate.

■ Under Sections 541(a)(6) and (7), property of the estate consists of proceeds, product, offspring, rents, or profits of or from property of the estate [except such as are earnings from services performed by an individual debtor after the commencement of the case] and any inter-est in property that the estate acquires after the commencement of the case. The concept of property of the estate is very broad. "Section 541 simply achieves the relatively basic congressional aim of casting a broad jurisdictional net over the interests in property that should justifiably be subject to the bankruptcy process." *In re Herberman*, 122 B.R. 273, 279–80 (Bankr.W.D.Tex.1990)(citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203–05, 103 S.Ct. 2309, 2312–13, 76 L.Ed.2d 515 (1983)). Property of the estate includes proceeds which are generated by the operation of estate assets during the pendency of the debtor's reorganization attempt, until a plan is confirmed, even after a chapter 11 is converted to chapter 7. *Kepler v. Independence Bank of Madison (In the matter of Ford)*, 61 B.R. 913, 917 (Bankr. W.D.Wis.1986). It also includes intangible assets of the debtor such as relationships with customers and parties dealing with the debtor, goodwill, and telephone numbers used by the debtor. *Sheppard's Dental Centers, Inc. v Southwest SDC, Inc. et al (In re Sheppard's Dental Centers, Inc.)*, 65 B.R. 274, 278 (Bankr.S.D.Fla.1986) (holding that a post-petition transfer of such assets of the estate was subject to being set aside under § 549).

In this case, the funds were tendered post-conversion via checks made payable to Motor Services. These funds were not turned over to the Trustee, but were endorsed and paid to reduce Linda Brewer's personal debt at Southeastern Bank. The checks were issued by entities which either:

(1) owed Motor Services money on the date of conversion; or

(2) were billed on Motor Services invoices for services rendered by Motor Services and paid post-conversion; or

(3) were payable to Motor Services for services rendered by Larry Brewer utilizing the trade name HMH En-

---

7. This case was converted to Chapter 7 prior to confirmation of a plan of reorganization.

terprises, but operating from the Motor Services premises, using Motor Services equipment, phone number, personnel, customers, business relationships, and other intangible assets, including goodwill; none of which were abandoned as estate assets by the Chapter 7 Trustee.

I conclude by a preponderance of the evidence that under any of the above theories the Trustee is entitled to recover these sums from Linda Brewer/Brewer Leasing Company, the entity for whose benefit the debt reduction payments were made.

First, if any of these funds were payments on accounts receivable, they are unquestionably property of the estate since they constitute proceeds of an estate asset—accounts receivable. 11 U.S.C. Section 541(a)(6). Second, if they were payments for work done directly by Motor Services then, again, they constitute estate property under Section 541(a)(6) since they represent post-petition earnings for services by a corporate, not individual, debtor. Third, although Larry Brewer contends, in the face of overwhelming evidence to the contrary, that these services were actually performed by HMH Enterprises, not Debtor Motor Services, I reject that contention because the facts simply do not bear it out. The checks were payable to Motor Services, the Debtor, and are presumptively funds of the Debtor. But even if Brewer's contention is true and the funds represent payment for work done under the HMH Enterprises nameplate, I hold that Larry Brewer's actual use of all the assets of Motor Services, under the guise of HMH Enterprises, renders the funds "proceeds . . . or profits" of intangible estate property wrongfully appropriated by Larry Brewer, and rightfully restored to the Chapter 7 Trustee. *Sheppard's Dental Centers, Inc., supra.*

None of the payments of these funds benefitted Debtor Motor Services' estate. They were diverted to debt reduction on the Southeastern Bank line of credit on which Linda Brewer was an obligor. Motor Services was never an obligor on that line of credit, and its pledge of accounts receivable as security, executed eight (8) months later, was never authorized by any order of this Court. It is therefore voidable under Section 549. Moreover, the provisions of the Code allowing Debtors-in-possession to incur debt were not complied with. Motor Services could incur only unsecured debt without notice and a hearing. 11 U.S.C. § 364(a). Because Motor Services did not follow the notice and hearing requirements of 11 U.S.C. § 364(c), the pledge of its accounts receivable is a nullity. In general, actions for which prior notice is requisite are void if no such notice and hearing occurs. *See generally Cedar Tide Corp. v. Chandler's Cove Inn, Ltd. (In re Cedar Tide Corp.)* 859 F.2d 1127 (2nd Cir.1988), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 405 (1989)(Circuit Court affirmed the nullification of a post-petition transfer of debtor-in-possession's main asset because transfer was made without requisite notice and hearing under § 363); *MMIA v. Hirsch (In re Lavigne),* 114 F.3d 379 (2nd Cir.1997) (cancellation of a professional liability insurance policy by debtor-in-possession was void because cancellation was found not to be in the ordinary course of business and notice to creditors was required under § 363).

Since the pledge of accounts receivable was ineffectual, there is no theory under which it was proper to take estate property to reduce the debt of Linda Brewer at Southeastern Bank. The Trustee is entitled to recover the sum of $255,287.56 as a voidable post-petition transfer.

*IV. Interest*

The Trustee requests an award of pre-judgment interest from July 3, 1997, the date of the filing of this adversary proceeding. Defendant asserts that the Court should only allow post-judgment interest as provided for in 28 U.S.C. Section 1961. In the alternative, Defendant

argues that if the Court awards pre-judgment interest, then the appropriate rate should be the rate determined by the federal statute. Consideration of an award of pre-judgment interest is left to the discretion of the Court. *See Wilson v. First National Bank (In re Missionary Baptist Foundation of America, Inc.),* 69 B.R. 536, 538 (Bankr.N.D.Tex.1987); 6 *Norton Bankr.L & Prac.2d* § 142:6 (2000). Courts which have considered an award of pre-judgment interest in § 549 actions have applied the same rationale to an award of interest in a preferential transfer action. *See Wilson v. First National Bank, supra;* Rieser v. Randolph County Bank (In re Masters), 137 B.R. 254 (Bankr.S.D.Ohio 1992). The considerations for awarding pre-judgment interest in a preference action include control and use of the property by the creditor, deprivation of control and use of the property by the estate, and the benefit or unjust enrichment to the party which retained the property. *See Foreman Industries, Inc. v. Broadway Sand & Gravel (In the matter of Foreman Industries, Inc.),* 59 B.R. 145, 155 (Bankr.S.D.Ohio 1986); *In re Smith,* 236 B.R. 91, 103–04 (Bankr.M.D.Ga.1999) "An award of prejudgment interest is compensatory, compensating the debtor's entire estate for the use of the funds for the period of time in which they were wrongfully withheld from the estate." *Rieser v. Randolph County Bank,* 137 B.R. at 262.

I find that this rationale supports an interest award in this case. The Trustee and the estate have been deprived of these funds since 1996. The action to recover them was filed in 1997 and has been litigated at considerable cost. That cost should not be borne entirely by creditors. I hold that pre-judgment interest shall be awarded from the date of the filing of this adversary proceeding. *See Smith v. Mark Twain National Bank,* 805 F.2d 278, 291 (8th Cir.1986); *In re Smith, supra.* at 104. The appropriate rate of interest is determined by 28 U.S.C. Section 1961(a) which is "a rate equal to the coupon issue yield equivalent (as determined by the Secre-tary of the Treasury) of the average accepted auction price for the last auction of the fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." 28 U.S.C. § 1961(a)(2000). This adversary proceeding was filed on July 3, 1997. The rate of interest as determined by 28 U.S.C. § 1961 is 5.65%. Accordingly, the Trustee is entitled to pre-judgment interest on the amounts awarded herein at the rate of 5.65% from July 3, 1997 to the date of this Order.

## ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that judgment shall be entered in favor of Anne Moore, Chapter 7 Trustee, and against Linda B. Brewer in the amount of $342,209.94, plus interest from July 3, 1997, to date in the amount of $61,756.74.