In re ATLANTA RETAIL, INC. f/k/a Wolf Camera, Inc., a Georgia Corporation, Tax ID No. 58–1210910, and affiliates, Debtors.

Nos. 01–83470, 01–83472, 01–83474, 01–83475.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Dec. 17, 2002.

Todd Meyers, Joel D. Bush, Kathleen O'Connell, Kilpatrick Stockton LLP, Atlanta, GA, for Movant.

Shannon Lowry Nagle, David Geiger, Powell, Goldstein, Frazer & Murphy LLP, Atlanta, GA, for respondent.

## *ORDER*

C. RAY MULLINS, Bankruptcy Judge.

**THIS CAUSE** is before the Court on Greater Atlanta McDonald's Operators Association's Motion for Allowance and Payment of Administrative Expense Claim (the "Motion"). The Greater Atlanta McDonald's Operators Association (hereinafter referred to as "GAMOA" or "McDonald's") seeks a ruling that their claim is entitled to administrative expense priority, pursuant to section 503(b) of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors object to the Motion and assert: 1) the Debtors and GAMOA never agreed to the specific terms of a contract; 2) the obligations that GAMOA seeks to enforce were outside Wolf Camera's ordinary course of business and never received court approval; and 3) the subject matter of the alleged contract did not result in any value to the Debtors' estate. This matter is a core proceeding under Title 28, section 157(b)(2)(B) of the United States Code.

After considering the record, including relevant pleadings and briefs, the Court concludes that GAMOA is entitled to an

administrative expense claim in the amount of $118,071.00.

## Findings of Fact
### The Parties and Their Representatives

GAMOA is an organization comprised of owners and operators of McDonald's restaurants throughout the Atlanta area. Moroch & Associates, an Atlanta area marketing firm, handles GAMOA's advertising business. Ms. Nancy Rumowicz ("Ms. Rumowicz") is Moroch & Associates' account director for the GAMOA marketing account.

Atlanta Retail, Inc. f/k/a Wolf Camera, Inc. ("Wolf Camera") and several related affiliates (collectively, the "Debtors") were primarily engaged in retail camera sales and film development. Wolf Camera was founded in Atlanta by Chuck Wolf. Wolf Camera rapidly grew into a national camera retailer. Prior to filing chapter 11, Wolf Camera had become the second largest photo retailer in the country, with an approximate total worth of $500,000,000.00. Jerry Carbone ("Mr. Carbone") was the Vice President of Advertising for Wolf Camera. Cam Glover ("Mr. Glover") was a marketing specialist who was responsible for promotions, cross promotions and internet promotions for Wolf Camera.

### The Cross Promotion [1] Negotiations Between GAMOA and Wolf Camera

Prior to the Debtors' bankruptcy filings, Ms. Rumowicz conceived an idea of an advertising campaign advertising McDonald's cheeseburgers via a cross promotion with Wolf Camera. Ms. Rumowicz scheduled a meeting with Mr. Carbone to discuss her cross promotion concept. On or about June 15, 2001, Ms. Rumowicz met in person with Mr. Carbone and Mr. Glo-

ver and presented the general terms of a similar promotion that was conducted in the Boston area that could serve as the model for the cross promotion. Mr. Carbone and Ms. Rumowicz also discussed time line logistics, the potential supplier of the cameras, potential additional cross promotion participants, buyback plans, and the type of camera that would be used in the promotion. Mr. Glover was assigned the task of verifying that Wolf Camera could source the cameras at the $1.75 per unit price that GAMOA was willing to pay.

Shortly after the first meeting, Ms. Rumowicz contacted Coca–Cola to gauge their interest in the cross promotion. Thereafter, Coca–Cola decided to join the promotion and agreed to pay $50,000.00 for its participation.

On June 21, 2001, the Debtors filed for relief under chapter 11 of the Bankruptcy Code. After learning of the bankruptcy filings, Ms. Rumowicz contacted Mr. Carbone to determine what affect, if any, the bankruptcy filings would have on the cross promotion project. Mr. Carbone indicated that Wolf Camera was restructuring its businesses and that the bankruptcy filings would not affect the planned promotion. Mr. Carbone indicated that the promotion would help facilitate their restructuring effort since an association with Coca–Cola and McDonald's would lend credibility to Wolf Camera's business operations.

Ms. Rumowicz and Mr. Carbone had a second meeting, during which they attempted to "tighten up" some of the details of the promotion. They also discussed whether the local promotion should be expanded to a national campaign. After the meeting ended, the parties were not certain whether Wolf Camera could source the promotional cameras for $1.75

---

1. A cross promotion is a marketing activity where two or more companies work together to create an advertising synergy that leverages the magnitude of each company's consumer base.

per unit. Both parties agreed to attempt to find more promotion participants to reduce the cost of the cameras.

After the second meeting, Ms. Rumowicz informed Mr. Carbone that GAMOA needed a decision by Wolf Camera as to whether the promotion was a "go or no go" by July 9, 2001. Prior to the July 9, 2001 deadline, Mr. Glover informed Ms. Rumowicz that Wolf Camera was able to find a vendor for the cameras at the price GAMOA wanted, and that Wolf Camera was eager to proceed.[2] Shortly thereafter, Mr. Carbone informed Ms. Rumowicz that he was pleased that the parties were moving forward with the cross promotion. On July 10, 2001, Ms. Rumowicz met with the GAMOA executive board and received final approval for the proposed promotion.

For the remainder of July, Ms. Rumowicz and Mr. Carbone were in constant communication to, among other things, obtain Wolf Camera's approval of the various advertising scripts and boards. By August 2001, the cross promotion was in full progress as the parties finalized details regarding shipment of the cameras and determined how the cameras would be allocated to each participating McDonald's restaurant. Ms. Rumowicz began to hear rumors circulating that Ritz Camera Centers, Inc. ("Ritz Camera") was going to purchase Wolf Camera. Mr. Carbone informed Ms. Rumowicz that any sale would not affect the promotion.[3]

In mid-August, the cameras arrived with 12 exposures, instead of the 24 exposures that the parties had contemplated. GAMOA considered the 12–exposure cameras a potential "deal breaker" because their value to GAMOA and its customers was thought to be significantly less than 24–exposure cameras. Consequently, on behalf of GAMOA, Ms. Rumowicz demanded certain concessions from Wolf Camera to compensate GAMOA for the use of 12–exposure cameras in the promotion. Ms. Rumowicz demands were as follows: a) that Wolf Camera lower the cost of each camera by 50¢; b) that Wolf Camera increase the buyback to 100%; c) that Wolf Camera issue an apology letter to GAMOA; and d) that Wolf Camera provide Wolf Pack memberships[4] for customers

**2.** The purchase order between Wolf Camera and the vendors indicates that Wolf Camera was able to purchase the 200,000 cameras for $1.43 each.

**3.** During the course of the Chapter 11 case, it became evident that the Debtors were exploring a sale of their assets. In fact, as the Court later became aware, the initial debtor-in-possession ("DIP") loan was only in an amount estimated to support the Debtors' operations a few months. The Debtors' DIP lenders did not believe the Debtors could reorganize their businesses and pushed for a sale of the Debtors' assets. Notwithstanding the DIP lenders' position, Chuck Wolf thought that he could reorganize the business in chapter 11. In fact, testimony revealed that Ritz Camera pulled out of the sales negotiations prior to the bankruptcy filings because Wolf Camera was still pursuing new financing for a restructuring.

Even after the Debtors filed the motion to sell the Debtors' assets to Ritz Camera pursuant to section 363 of the Bankruptcy Code, Mr. Wolf also continuously pursued a reorganization alternative. The DIP lenders even allowed the Debtors to use a portion of the DIP loan to pursue a reorganization while the lenders pushed for a sale. Ritz Camera knew that the Debtors were proceeding on two simultaneous, but separate tracks—sale of assets and reorganization as a going concern.

Ritz Camera proposed to purchase the Wolf Camera name as a part of the sale of assets. As a result, any goodwill associated with the Wolf Camera name would inure to Ritz Camera's benefit if the sale was completed as contemplated. In fact, since completion of the sale, Ritz Camera continues to operate the purchased stores as Wolf Camera units.

**4.** A Wolf Pack membership is a service offered to customers which entitles them to among other things, discounts on purchases and processing orders.

purchasing the cameras. Mr. Carbone consulted with other Wolf Camera officers to consider GAMOA's demands. Thereafter, Mr. Carbone informed Ms. Rumowicz that the Wolf Pack membership could not be provided and Wolf Camera would only reduce the price by 25¢, but Wolf Camera agreed to the proposed 100% buyback.[5] GAMOA accepted the concessions offered by Wolf Camera, however, GAMOA decided that it would defer $50,000.00 of the total payment due to Wolf Camera until the end of the promotion. Wolf Camera did not oppose the deferral of this payment.

In late-August, the news regarding Ritz Camera's proposed purchase of the Debtors began to receive press attention. The increased media coverage of a potential purchase caused GAMOA to once again question Wolf Camera's commitment to the cross promotion. Ms. Rumowicz therefore proposed that the parties memorialize the terms of the promotion.[6] Mr. Carbone was receptive to this proposal, and therefore, Ms. Rumowicz had a promotional legal firm in Chicago draft a contract. The contract was forwarded to Wolf Camera for execution. However, the contract was never signed because Mr. Carbone's superiors decided that no contracts would be signed during this time. Mr. Carbone did not communicate this decision to Ms. Rumowicz.

### The Promotion

Wolf Camera's obligations under the promotion included the purchase and delivery of cameras to GAMOA; the attachment of on-camera coupons for free film developing; the honoring of all coupons tendered for developing, on or before De-cember 1, 2001; and the repurchase of all full unsold cases of cameras at the conclusion of the promotion. GAMOA's obligations under the promotion included the administration of the promotion and the payment to Wolf Camera of $1.50 per camera for the 200,000 cameras delivered to McDonald's.

GAMOA spent over $1,000,000.00 to prepare and conduct the cross promotion. Approximately 200 Atlanta area McDonald's restaurants participated in the campaign from August 27, 2001, through September 27, 2001. The parties subsequently agreed to extend the campaign through October 18, 2001. During the promotion, each McDonald's customer who purchased an extra-value meal was entitled to purchase a camera for $1.99 and to have the film developed free of charge by Wolf Camera, on or before December 1, 2001. The promotion featured the Wolf Camera name in television, radio, and print advertising. Approximately 60,000 promotional cameras were sold through the participating McDonald's restaurants.

### The Conclusion of the Promotion

At the conclusion of the promotion, an accounting was undertaken to determine the number of full cases of unsold cameras. According to the evidence at trial, there were 1,378 cases (96 cameras per case) of unsold cameras. Therefore, using the buyback price of $1.50 per camera, GAMOA was owed $198,432.00 for the unsold cameras. The parties agreed that this amount should be reduced to $148,432.00 to account for the $50,000.00 payment owed by GAMOA to Wolf Camera. Since the filing of the Motion, GAMOA has sold

---

5. The vendor, Americam, was going to repurchase the cameras at 90¢ per camera. A 100% buyback would constitute a 60¢ per unsold camera financial obligation on behalf of the Debtors.

6. Ms. Rumowicz and Mr. Carbone testified that they had both frequently participated in promotions for which no written contract was used.

some of the remaining cameras and has reduced its claim to $118,071.00.

## Conclusions of Law

### A. *The Debtors and GAMOA Entered Into a Valid and Enforceable Contract*

 Bankruptcy courts look to state law to determine the validity and enforceability of a contract. *Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1121 (11th Cir.1998). Although the parties did not have a valid, enforceable written contract, the evidence at trial established that there was a valid, enforceable oral contract. To be enforceable, oral contracts must be certain and definite in their terms. *Goldstein v. Kellwood Co.*, 933 F.Supp. 1082, 1087 (N.D.Ga.1996). A plaintiff must show "that there was a meeting of the minds of the contracting parties—mutuality—as to every essential element of the oral agreement." *Super Valu Stores, Inc. v. First Nat'l Bank of Columbus, Georgia*, 463 F.Supp. 1183, 1193 (M.D.Ga.1979). When all of the contract conditions are agreed upon and nothing is left to further negotiation, there has been a meeting of the minds and a contract is formed. *Jackson v. Easters*, 190 Ga.App. 713, 379 S.E.2d 610, 611 (1989).

 The Debtors assert that an oral contract did not exist between the parties because there was not a "meeting of the minds" as to certain essential elements. The Debtors specifically argue that the buyback provision made the agreement a non-ordinary course contract that had to be approved by the Court. The Court is not persuaded by this assertion. The parties actions with respect to the essential elements of the oral agreement, evince a "meeting of the minds."

There are five essential elements of the oral agreement between the parties: (1) Wolf Camera agreed to source the cameras for the promotion; (2) GAMOA agreed to pay Wolf Camera a total of $300,000.00 for the cameras;[7] (3) GAMOA agreed to conduct a promotion with radio, television, and print advertising that featured the Wolf Camera name and logo; (4) Wolf Camera agreed to honor coupons issued during the promotion for free film processing; and (5) Wolf Camera agreed to buyback all full cases of unsold cameras. There is no dispute that Wolf Camera agreed to, and in fact, sourced the promotional cameras. Pursuant to a purchase order dated July 10, 2001, Wolf Camera purchased 200,000 cameras from Americam at $1.43 per camera. In fact, the purchase order describes the cameras as "McDonald/Coca–Cola" units. Moreover, Americam prepared an invoice dated July 13, 2001, indicating that it billed Wolf Camera $286,000.00 for 200,000 "McDonald/Coca–Cola/Wolf Camera 12–exposure 400 speed non-flash" cameras.

There is no dispute that GAMOA agreed to pay Wolf Camera $300,000.00. The evidence establishes that GAMOA tendered and Wolf Camera accepted an initial payment of $250,000.00, with the remaining $50,000.00 to be paid at the conclusion of the promotion. There is no dispute that GAMOA agreed to conduct a promotion with radio, print, and television advertising that featured the Wolf Camera logo, since they spent over $1,000,000.00 to do just that. There is no dispute that Wolf Camera agreed to honor the coupons for free film processing. Mr. Carbone testified that at least 600 of the promotional cameras sold in McDonald's restaurants were brought to Wolf Camera and processed.

The Court finds that the only essential element of the oral contract that was ini-

---

7. This amount includes the $50,000.00 contribution from Coca Cola.

tially in dispute concerns the buyback of the unsold cameras. Until it was discovered that the cameras were 12 and not 24–exposure units, it is arguable as to whether there was a "meeting of the minds" regarding the buyback condition. After the cameras arrived, the Court finds that credible evidence established that the parties agreed to a 100% buyback. The Court finds Ms. Rumowicz's testimony credible that when she discovered that the cameras were 12–exposure instead of 24–exposure as agreed, she immediately communicated GAMOA's displeasure to Wolf Camera. The Court finds that GAMOA insisted on several concessions from Wolf Camera to compensate for the 12–exposure cameras. Wolf Camera made a counteroffer, including a 100% buyback of any unsold cases of cameras. Wolf Camera's counteroffer was accepted by GAMOA. At this point, an oral contract was formed, as all of the essential contract provisions were agreed upon, and nothing was left to further negotiation; there was a "meeting of the minds."

The Debtors argue that Ritz Camera was a necessary party to the agreement and therefore, a necessary signatory to the contract. The fact that a Ritz Camera representative did not sign the written contract does not change the Court's conclusion that a valid contract was formed. Since the Court finds that a valid oral contract was formed between GAMOA and Wolf Camera, this argument is not meritorious.

### B. *The Contract Between Wolf Camera and GAMOA was in Wolf Camera's Ordinary Course of Business*

■■ Section 363(c) of the Bankruptcy Code permits chapter 11 debtors to enter into transactions in the ordinary course of business without court approval; however, transactions outside of the ordinary course, must be authorized by the courts.

This Code provision is "designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets." *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2nd Cir.1997).

■■ The term "ordinary course" has generally been interpreted "to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business" *Id.* (*citing In re Watford*, 159 B.R. 597, 599 (M.D.Ga. 1993), *aff'd without opinion*, 61 F.3d 30 (11th Cir.1995)). Courts use two tests to determine if a transaction is within the debtor's ordinary course of business. *In re HMH Motor Services, Inc.*, 259 B.R. 440, 449 (Bankr.S.D.Ga.2000). The first test is the horizontal test, also known as the "industry wide test," and the second is the vertical test, also called the "creditor's expectation test." *Hirsch*, 114 F.3d at 384.

Applying the horizontal test, courts inquire whether the transaction is one that a similar business would engage in the ordinary course of its business affairs. *Id.* at 385. More specifically, the court attempts to determine if the transaction is the type of transaction commonly undertaken in the community. Applying the vertical test, courts examine the transaction from the vantage point of a hypothetical creditor and query whether the creditor was exposed to economic risk of a nature different from those he expected when he decided to contract with the debtor. *Id.*

■■ Applying the horizontal test to this case, the question becomes whether the promotional contract was one in which a similar business would engage. The subject contract provided the financially

distressed [8] Wolf Camera an opportunity to enter into a contract with two advertising giants [9]—McDonald's and Coca–Cola. Coca–Cola might very well be the single most recognizable brand name in the Atlanta area given its pervasive ties to the history of the city. For a calculated financial exposure, Wolf Camera gained immeasurable promotional exposure by its association with McDonald's and Coca–Cola throughout the Atlanta area where its bankruptcy case was pending. Examined in this context, it is hard for this Court to imagine a similarly situated financially distressed debtor, attempting to restructure, that would not enter into such a promotion. Furthermore, not only is this a transaction that a similar business would engage in, as the evidence at trial indicated, this type of contract was not uncommon to Wolf Camera. Wolf Camera conceded at trial that it was involved in several e-commerce cross promotions and that it considered five to ten promotions per day. Mr. Carbone also testified that both prior to and after filing for chapter 11 relief, Wolf Camera advertised weekly in newspapers. Wolf Camera conceded that it did not enter into written contracts for the weekly advertising program.

Wolf Camera argues that while advertising efforts may have been in the ordinary course of business, the 100% buyback provision was not a feature of its ordinary course promotions. The Court finds this argument unpersuasive, as it takes too narrow of a view of ordinary course. As Mr. Carbone testified, cross promotions were a part of Wolf Camera's ordinary course of business. The cross promotion, not the buyback, encompassed the contract between Wolf Camera and GAMOA. The buyback was simply a condition of the contract that reflected the relative bargaining positions of the parties, but did not affect whether the transaction was within the ordinary course.

The Court acknowledges that had Wolf Camera entered into an advertising agreement with smaller or lesser known entities with substantially less bargaining power, they may not have felt compelled to accept the buyback condition. However, this was not the case. Both Coca–Cola and McDonald's each spend three times the approximate enterprise value of Wolf Camera in worldwide advertising per year. *See Top 100 Global Marketers 2001 edition, supra* note 9, at 11. Therefore, based solely on their market presence, the Court finds it not unusual for McDonald's and Coca–Cola to demand the buyback condition. Furthermore, the Court finds it not outside its ordinary course for Wolf Camera to accept the buyback condition.

Applying the vertical test, the question becomes whether a hypothetical creditor would have expected notice and hearing before Wolf Camera entered into the promotion. The creditors of the Debtors' estate would have reasonably expected the Debtors to continue marketing and advertising in an effort to increase sales and customer traffic in Wolf Camera stores. This is especially true given Wolf Camera's stubborn insistence on reorganization, even when its principal secured lenders insisted on a liquidation via a section 363 sale. Furthermore, the Official Com-

---

**8.** Wolf Camera could not even fund payroll immediately after the bankruptcy filing without the DIP loan and had lost most of its trade credit with its large camera vendors.

**9.** The Coca–Cola Company spent approximately 1.5 billion dollars on worldwide advertising in 2000. The McDonald's Corporation spent approximately 1.4 billion dollars on worldwide advertising in 2000. *Top 100 Global Marketers 2001 edition* (visited Dec. 17, 2002) <http://www.adage.com/page.cms?pageId=748>.

mittee of Unsecured Creditors (the "Committee") vigorously opposed the sale to Ritz Camera. The Committee argued extensively that Wolf Camera could be reorganized and that the Court should have given the Debtors more time to pursue the reorganization alternative. It would be hard to imagine that in pursuing a reorganization effort the unsecured creditors would not have been pleased that Wolf Camera had the good business judgment to negotiate an Atlanta area promotional campaign with Coca–Cola and McDonald's.

The Debtors and the Committee argue that the contract with GAMOA fails the vertical test because Wolf Camera's creditors did not reasonably expect it to enter into a promotional contract that could bind the estate with a potential $300,000.00 administrative expense exposure due to the buyback provision. This argument is unpersuasive to the Court because it fails to look at the totality of the circumstances as discussed herein.

Certainly, if examined after the fact, the unsecured creditors did not want the Debtor's estate to be saddled with a potential $300,000.00 administrative expense claim in a failed reorganization case. However, at the time of the transaction, a reasonable unsecured creditor would likely have approved of an advertising campaign with McDonald's and Coca–Cola that offered an extensive multimedia advertising blitz for a maximum liability of $300,000.00.

For the foregoing reasons, the Court finds that the promotional contract between Wolf Camera and GAMOA was in the ordinary course of Wolf Camera's business and did not require court approval. For the Court to hold otherwise, would condone the Debtors to use section 363 of the Bankruptcy Code as a sword, after it induced the other party to expend significant sums of money in a joint endeavor geared to provide substantial promotional benefits to both parties. The bankruptcy laws were not "intended to be used as a sword by the rapacious." *Shell Oil Company v. Waldron (In re Waldron)*, 785 F.2d 936, 940 (11th Cir.1986). Section 363 is designed to facilitate reorganization by allowing the debtor to continue to operate without constant court oversight. This objective is balanced with the goal of protecting assets of the estate. Hence the statute balances protections for both creditors and debtors. Here, the Debtors are attempting to use a statutory provision designed for their protection, as a weapon.

## C. *The Contract Between the Debtors and GAMOA Provided a Concrete and Direct Benefit to the Debtors' estate.*

■ Since the Court concludes that a valid, enforceable oral contract was entered into between GAMOA and Wolf Camera, in the ordinary course of business, the only remaining inquiry is whether GAMOA's claim qualifies as an administrative expense pursuant to section 503(b)(1)(A) of the Bankruptcy Code. The relevant portion of section 503(b) states that "[a]fter notice and hearing, there shall be allowed administrative expenses ... the actual, necessary cost and expenses of preserving the estate including wages, salaries, or commission for *services rendered after the commencement of the case.*" 11 U.S.C. § 503(b)(1)(A) (emphasis added). The Eleventh Circuit has interpreted this Code provision to not only require "that the expense be 'actual' and 'necessary,' but also that there be a concrete benefit to the debtor's estate." *In re Beverage Canners Int'l Corp.*, 255 B.R. 89, 92 (Bankr.S.D.Fla. 2000) (*citing In re Subscription Television of Greater Atlanta*, 789 F.2d 1530 (11th Cir.1986)).

■ It is undisputed that the promotional contract between GAMOA and Wolf Camera was post-petition, therefore, the issue is whether the cross promotion

provided Wolf Camera with concrete benefits. The Court finds that the promotion provided Wolf Camera with both tangible, quantifiable benefits and intangible, immeasurable benefits.

Wolf Camera originally purchased 200,000 cameras from Americam at a purchase price of $1.43 per camera, for a total purchase price of $286,000.00. GAMOA paid Wolf Camera $250,000.00, with an additional payment of $50,000.00 due at the end of the promotion, for a total purchase price of $300,000.00. Therefore, the Debtors initially negotiated a direct and concrete benefit of $14,000.00.

Furthermore, the Debtors received a concrete, substantial, and direct benefit from GAMOA's marketing and advertising efforts relating to the promotion. Ms. Rumowicz testified that GAMOA spent approximately $1,000,000.00 on advertising in relation to the promotion. Advertising can provide both a current benefit to the party being promoted, as well as continuing benefits well into the future:

> Each piece of advertising influences sales today, and at the same time adds another brick to the structure of goodwill that increases business tomorrow. The key element is the customer holdover effect. It can occur in two ways. Advertising may lead directly to sales; and many new buyers, being satisfied with the brand, may repeat the purchase. Or, the advertising stimulus, instead of winning fresh converts, may increase brand usage per customer; and this habit may persist far into the future.

Nariman K. Dhalla, *Assessing the Long-Term Value of Advertising*, Harvard Business Review, January–February 1978; at 87; *see also* James R. Gregory, The Impact of Advertising on Brand Momentum, Business Week, 1998, at 6 ("In fact, advertising is largely responsible for brand momentum, and therefore for Brand Power. Simply put, companies that spend more on advertising build greater momentum, and more powerful brands.").

The Debtors argue that *In re Enron Corp.*, 279 B.R. 79 (Bankr.S.D.N.Y.2002) ("*Enron I*"), *In re Enron Corp.*, 279 B.R. 695 (Bankr.S.D.N.Y.2002) ("*Enron II*"), and *Broadcast Corporation of Georgia v. Broadfoot* (*In re Subscription Television of Greater Atlanta*), 789 F.2d 1530 (11th Cir.1986) support their position that the estate did not receive a benefit from the promotional contract. All three cases are distinguishable from the case before the Court. In each case, the court was examining prepetition agreements. In *Enron I* and *Enron II*, the claim was for services that the debtor did not avail itself of postpetition. In *Subscription Television*, the claim was for services rendered pre-and post-petition. *Subscription Television*, 789 F.2d at 1531. The court only allowed an administrative expense for the services rendered post-petition *Id.* at 1532.

In the case at bar, the promotional contract was entered post-petition, the services were rendered post-petition, and the Debtors received benefits from the promotion. Accordingly, the Debtors reliance on these cases is misplaced.

The promotion undoubtedly provided the Debtors with concrete and direct benefits. To find otherwise would flout the policy behind the administrative expense priority provision. One of the predominant policies behind section 503(b) is:

> to facilitate the rehabilitation of insolvent businesses by encouraging third parties to provide those businesses with necessary goods and services... Obviously, without a guarantee of first priority payment, third parties would not deal with a business in Chapter 11 reorganization, and the goal of rehabilitation could not be achieved.

*Alabama Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co.)*, 963 F.2d 1449, 1453 (11th Cir.1992). For this Court to accept the Debtors' argument that the promotion did not provide benefit to the Debtors' estate simply because after the fact, it suggested that the promotion was not successful or because the promotion provided difficult to measure, intangible benefits, would effectively discourage parties from dealing with a chapter 11 debtor without a guarantee of first priority payment.

### Conclusion

Section 503(b)(1)(A) of the Bankruptcy Code provides administrative expense priority for the "actual and necessary costs and expenses of preserving the estate, including ... for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). Subsequent to the Debtors' bankruptcy filings, GAMOA and Wolf Camera entered into a valid and enforceable contract; the contract was entered into in the ordinary course of business; and the contract provided a concrete and direct benefit to the Debtors' estate. Accordingly, GAMOA is entitled to administrative expense priority claim in the amount of $118,071.00, pursuant to section 503(b) of the Bankruptcy Code.

For all of the foregoing reasons,

**IT IS ORDERED** that GAMOA's Motion be and is hereby **GRANTED**.

The Clerk's office is directed to serve a copy of this Order upon the all parties of interest in the instant matter.