**In re CAMELOT CASINO CRUISES, INC., Debtor.**

**No. 8:99 BK 18423 PMG.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

July 6, 2005.

B. Gray Gibbs, St. Petersburg, FL, for Debtor.

## ORDER ON CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AS TO MALCOLM M. BABB'S REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for hearing to consider the Motion for Summary Judgment as to Malcolm M. Babb's Request for Payment of Administrative Expense. The Motion for Summary Judgment was filed by Stephen L. Meininger, as Chapter 7 Trustee.

Malcolm M. Babb (Babb) asserts that he is entitled to the allowance of an administrative expense claim for postpetition rent and other charges arising from the Debtor's prepetition lease of certain property located in South Carolina.

Stephen L. Meininger, as the Chapter 7 Trustee (the Trustee), contends that there are no genuine issues of material of fact, and that Babb's administrative expense claim should be disallowed as a matter of law, because (1) the lease was never signed and is therefore void, and also because (2) the lease did not provide any benefit to the estate within the meaning of § 503 of the Bankruptcy Code.

## Background

The Debtor, Camelot Casino Cruises, Inc., was engaged in the business of operating a gambling ship. Its primary asset was a vessel known as the M/V Excalibur.

On or about February 4, 1999, Babb met with two of the Debtor's officers for the purpose of negotiating the terms of the Debtor's lease of certain property from Little River Campground, Inc. and Brenda R. Babb. The property included a pier and dock located in South Carolina that the Debtor proposed to use for berthing the Excalibur. (Doc. 120, pp. 1–2).

At or about the time of the meeting, Babb and the Debtor's officers contacted Pratt Gasque, an attorney in South Carolina, and asked him to prepare a written lease agreement to document the terms of the parties' understanding (the Lease). (Doc. 120, p. 2).

A check dated February 3, 1999, was written on the Debtor's operating account, and made payable to the Pratt Gasque Trust Account in the amount of $5,000.00. (Doc. 433, Exhibit C). According to Babb, the check was intended to pay the fees incurred by Gasque for the preparation of the Lease, with the balance of the funds to be applied to the Debtor's obligations under the lease. (Doc. 120, p. 2).

Pursuant to his instructions, Gasque prepared a document entitled "Agreement of Lease." (Babb's Proof of Claim No. 131, Exhibit A–1). Generally, the Agreement of Lease prepared by Gasque provided that the Debtor would lease certain real property in Little River, South Carolina from Little River Campground, Inc. and Brenda Babb, for an initial term of two years beginning on April 1, 1999, at a minimum annual rental of $400,000.00, payable at the rate of $33,333.33 per month. The Agreement of Lease prepared by Gasque also provided that the

Debtor was permitted to use the property "for the purpose of berthing and operating a casino cruise ship."

The Agreement of Lease prepared by Gasque was never signed.

On March 28, 1999, Steve Squitiro, an officer of the Debtor, wrote a letter to Babb in which be requested a loan to fund the Debtor's operations. (Doc. 433, Exhibit D). In the letter, Squitiro stated in part:

I am proposing a deal that would be very secure for you and accomplish getting Camelot Casino Cruises operating in Myrtle Beach by May.

If you lend Camelot Casino Cruises $400,000, we will leave Tarpon Springs and sail out of your dock with the Excaliber [sic]. The ship is currently operating out of Tarpon . . .

Upon agreeing to a deal, we will immediately bring the ship to your dock. You would then transfer $250,000 to Camelot Casino Cruises to pay for all existing obligations in Tarpon and the start-up expenses in Myrtle Beach. You would pay $50,000 needed for improvements: dock, clearing property, parking lot, water, electric, office, etc. . . .

.     .     .     .     .

Our dock deal would remain the same and you would receive $33,000 per month rent, the first payment coming thirty days after the maiden sail.

.     .     .     .     .

Please advise us if you have any interest in talking about the possibility of working this deal out.

(Doc. 433, Exhibit D). Babb did not loan $400,000 to the Debtor as requested in the letter. (Doc. 120, p. 4).

On August 1, October 1, November 1, and December 1, 1999, Babb sent written invoices to the Debtor for "past due lease payments" and other charges "pursuant to terms of Lease Agreement." (Babb's Proof of Claim No. 131, Exhibit A–2). The invoices reflect amounts due for lease payments at the rate of $40,000.00 per month beginning in March of 1999, and also reflect an amount due of $200,000.00, representing "estimated" charges for dock repair, site work, labor and materials, and permitting.

The Debtor never paid the monthly invoices. (Doc. 406, Trustee's Affidavit, p. 2).

On November 15, 1999, the Debtor filed a petition under Chapter 11 of the Bankruptcy Code.

The Debtor was not in possession of the Excalibur at the time that the bankruptcy petition was filed, because the ship had been arrested by the first mortgage holder. (Doc. 406, p. 2).

The Debtor recovered the ship during the chapter 11. After its recovery, the ship was docked in Clearwater, Florida. (Doc. 406, p. 2).

On or about March 13, 2000, the Debtor sold the ship to Space Coast Cruises pursuant to an Order authorizing the sale entered by the Court.

The ship, the M/V Excalibur, was never docked at Babb's property in South Carolina during the pendency of the Debtor's bankruptcy case. (Doc. 406, p. 2).

On September 7, 2000, Babb filed his Request for Payment of Administrative Expense. (Doc. 120). The claims of Brenda R. Babb and Little River Campground, Inc. had been transferred to Babb by virtue of an Assignment of Interest filed on March 6, 2000. (Doc. 65).

In his Request, Babb asserts that the Debtor never rejected the Lease of the South Carolina property in its bankruptcy case. Consequently, Babb seeks the entry

of an Order allowing his claim "for post-bankruptcy rents and other charges as administrative expenses with priority under 11 U.S.C. § 503(b)(1)(A) and § 507(a)(1)." (Doc. 120, p. 7).

The case was converted to a case under Chapter 7 on June 4, 2001, and Stephen L. Meininger was appointed as Chapter 7 Trustee.

### Discussion

The Trustee filed a Motion for Summary Judgment as to Babb's Request for Payment of Administrative Expense. In the Motion, the Trustee contends that there are no genuine issues of material fact, and that the only legal issues are (1) whether the Lease of Babb's property to the Debtor is a valid and enforceable agreement, and (2) whether the Lease provided a benefit to the estate, so that Babb is entitled to an administrative expense claim under § 503(b) of the Bankruptcy Code.

### A. The Lease is not enforceable.

The validity and enforceability of the Lease is governed by South Carolina law. The property subject to the Lease is in South Carolina, and the proposed Lease drafted by Pratt Gasque provides that the Lease "shall be governed by, construed and enforced in accordance with the laws of the State of South Carolina." (Babb's Proof of Claim No. 131, Exhibit A-1, p. 7).

■ Section 27–35–20 of the Laws of South Carolina provides as follows:

**TITLE 27. PROPERTY AND CONVEYANCES**

**CHAPTER 35. CREATION, CONSTRUCTION AND TERMINATION OF LEASEHOLD ESTATES**

**§ 27–35–20. Agreement for more than one year is void unless in writing.**

Any agreement for the use or occupation of real estate for more than one year shall be void unless in writing.

S.C.Code Ann. § 27–35–20. Generally, the purpose of such statutes is to protect title to real estate from the uncertainty associated with oral testimony. *Empfield v. Kimbrough,* 900 P.2d 1153, 1155 (Wyo. 1995).

■ In this case, the proposed agreement between the Debtor and Babb involved the lease of Babb's real property for an initial term of two years. In other words, it is an "agreement for the use or occupation of real estate for more than one year." The written agreement drafted by Gasque, however, was never signed by the parties. Consequently, the agreement is deemed void in accordance with § 27–35–20 of the Laws of South Carolina.

Babb asserts that the South Carolina statute does not apply to the agreement, however, because there are "sufficient writings to document the Lease agreement and sufficient performance by the Debtor in compliance with the terms of the Lease to take this Lease out of the operation of the Statute of Frauds." (Doc. 433, p. 3). According to Babb, the documents that evidence the Lease include the check dated February 3, 1999, and Squitiro's letter dated March 28, 1999. The partial performance of the Lease, according to Babb, includes the site preparation work that allegedly occurred at the South Carolina property.

■ To remove an oral agreement from the operation of § 27–35–20 based on a memorandum of the contract, a party must produce a writing that reasonably identifies the subject matter of the agreement, that sufficiently indicates that a contract had been made, and that states the essential terms of the contract with reasonable certainty. *Player v. Chandler,* 299 S.C. 101, 382 S.E.2d 891, 895 (1989).

■ Further, to remove the agreement from the statute based on part performance, the party must establish acts that "relate clearly and unequivocally to the agreement, exclusive of any other relation between the parties touching the agreement." *Player v. Chandler*, 382 S.E.2d at 894. See also *Gibson v. Hrysikos*, 293 S.C. 8, 358 S.E.2d 173, 176 (1987).

■ In this case, the Court finds that the activities that occurred after the meeting in February of 1999 do not establish the existence of a final agreement between the parties sufficient to remove the Lease from the operation of § 27–35–20. On the contrary, the documents and actions indicate that the parties never reached a "meeting of the minds" regarding the terms of the proposed Lease.

First, for example, Babb asserts that the parties agreed at the meeting in February that the initial term of the Lease would commence on March 1, 1999. (Doc. 120, p. 2). The proposed Lease Agreement drafted by Gasque, however, states that the initial term of the Lease would begin on April 1, 1999, and the letter from Squitiro to Babb dated March 29, 1999, states that the first month's rent would be paid "thirty days after the maiden sail." (Babb's Proof of Claim No. 131, Exhibit A–1; Doc. 433, Exhibit D).

Second, Babb asserts (and the draft of the Lease Agreement reflects) that the Debtor was to make rental payments in the minimum amount of $400,000.00 per year, payable at the rate of $33,333.33 per month, with a maximum charge of $600,000.00 per year. The letter from Squitiro to Babb, however, states that Babb would receive rent in the amount of $33,000 per month, and the invoices that Babb sent to the Debtor beginning in August of 1999 charge the sum of $40,000.00 per month. (Babb's Proof of Claim No. 131, Exhibit A–2). There is no explanation

as to how Babb calculated the $40,000.00 monthly rent set forth in the invoices.

Third, Babb contends that the check written on the Debtor's operating account in the amount of $5,000.00 constitutes documentation of the agreement reached by the parties at their meeting on February 4, 1999. The check is actually dated February 3, 1999, however, the day before the meeting occurred. Further, and even more importantly, the check is expressly made payable to Gasque's Trust Account, not to Babb, and Gasque subsequently returned the sum of $2,250.00 to the Debtor. These factors are inconsistent with Babb's assertion that $4,500.00 of the $5,000.00 was intended to represent payment to Babb of the Debtor's obligations under the Lease.

Fourth, Squitiro's letter to Babb dated March 28, 1999, indicates only that the Debtor was considering South Carolina as a base for its future operations. It is clear from the letter, however, that the Debtor did not believe that it was already contractually bound to use and pay rent for Babb's dock.

The Debtor was financially unable to wind up its affairs in Tarpon Springs, where the Excalibur was docked, for example, and to relocate the ship to South Carolina. Consequently, the purpose of Squitiro's letter was to propose a deal to Babb whereby Babb would fund the exit of the ship from Tarpon Springs and the start-up of the Debtor's operations in South Carolina. According to Squitiro, "I am proposing a deal that would ... accomplish getting Camelot Casino Cruises operating in Myrtle Beach by May." Further, Squitiro states that the Excalibur would be moved to South Carolina "[u]pon agreeing to a deal."

It appears from the letter that the Debtor regarded the new proposal as a continu-

ation of its earlier negotiations with Babb. Although Squitiro states that the "dock deal would remain the same," the reference does not establish that a "dock deal" had already been concluded. Instead, since the Debtor could not afford to move its ship to South Carolina, it is clear that the Debtor considered the "dock deal" to be only one component of a larger arrangement with Babb that had not been fully negotiated.

Fifth, Babb asserts that the Debtor never disputed the invoices that he submitted to it beginning in August of 1999. Although the Debtor may not have objected to the invoices in writing, it is undisputed that the Debtor did not pay the invoices at the time that they were sent.

Further, the invoices include a charge in the amount of $200,000.00 that admittedly represents only an "estimated" cost for the site work that would need to be performed to bring the Excalibur to South Carolina. According to Babb, the charge was "based on estimates received from contractors who were to perform the work and the permitting necessary to meet local and state regulations." (Doc. 433, p. 2). The $200,000.00 charge on the invoices is not supported by any underlying documents showing that any of the site work was actually performed, or that the Debtor was involved in obtaining the estimates or procuring the contractors.

The invoices sent to the Debtor reflect only a unilateral act by Babb to collect money from the Debtor. They do not include any evidence that the Debtor was "performing" under the proposed Lease Agreement with Babb.

The Court has considered all of the post-meeting documents and conduct discussed above, and finds that they do not establish that the parties ever reached a final agreement as to the essential terms of the Lease. Omitted or indefinite terms and conditions include the commencement date of the Lease, the amount of the rent, the time and manner of payment, and the relative responsibilities for the site improvements and start-up costs. *Player v. Chandler*, 382 S.E.2d at 893–94. Additionally, no conduct of the Debtor clearly and unequivocally relates to a binding contract between the parties. The Court is satisfied that no final agreement was ever reached, and that negotiations were never completed. *Player v. Chandler*, 382 S.E.2d at 894–95.

In summary, the proposed Lease Agreement between the Debtor and Babb is deemed void pursuant to the Laws of South Carolina because it was not signed. Further, the documents and actions of the parties after their meeting on February 4, 1999, do not establish that they ever reached a "meeting of the minds" regarding the Lease of Babb's property to the Debtor. The proposed Lease Agreement is not enforceable.

**B. Babb is not entitled to an administrative expense under § 503(b) of the Bankruptcy Code.**

■ The Court has found that the proposed Lease Agreement between the Debtor and Babb is not a valid and enforceable contract. Even if the Lease were enforceable, however, Babb would not be entitled to an administrative expense claim for the rents and related charges asserted under the agreement.

■ Section 503(b) of the Bankruptcy Code provides in part:

**11 U.S.C. § 503. Allowance of administrative expenses**

     .     .     .     .

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b). "The Eleventh Circuit has interpreted this Code provision to not only require 'that the expense be "actual" and "necessary," but also that there be a concrete benefit to the debtor's estate.'" *In re Atlanta Retail, Inc.*, 287 B.R. 849, 858 (Bankr.N.D.Ga.2002)(quoting *In re Beverage Canners Int'l Corp.*, 255 B.R. 89, 92 (Bankr.S.D.Fla.2000))(citing *In re Subscription Television of Greater Atlanta*, 789 F.2d 1530 (11th Cir.1986)).

■ "In order for a claim on a postpetition expense to be allowed as an administrative priority claim, an estate must actually make beneficial use of any value received in exchange for the incurring of the expense." *In re Right Time Foods, Inc.*, 262 B.R. 882, 884 (Bankr.M.D.Fla. 2001).

To establish an administrative claim in this case, therefore, Babb must show that the Debtor received an actual, concrete benefit in exchange for payment of the postpetition rent and related charges under the Lease. Babb failed to satisfy the standard required by § 503(b)(1).

In his Affidavit, Stephen L. Meininger, as the Chapter 7 Trustee, attested as follows:

1. "Upon information and belief, the Debtor's vessel, 'M/V Excalibur' (the 'Cruise Ship') was never docked in South Carolina."

2. "The Debtor did not have possession or control of the Cruise Ship at the time of filing its petition because the Cruise Ship had been arrested by the first mortgage holder."

3. "After the Debtor recovered the Cruise Ship, it was docked at Clearwater, Florida."

4. "The bankruptcy estate did not use or derive any benefit from the dock in South Carolina which is the subject to the [sic] Babb's administrative expense claim because the Cruise Ship was never docked in South Carolina nor did the Debtor physically possess the dock property."

(Doc. 406, Paragraphs 7, 8, 10, 13). The Debtor never docked the Excalibur at Babb's property in South Carolina, and the Debtor never conducted its business from Babb's property.

Babb does not contend that the Excalibur was ever berthed in South Carolina. Instead, Babb asserts that the Debtor "took possession" of the property by sending its representative to begin certain dock work and site improvements that would be required to dock the ship on the premises. (Doc. 433, p. 2). Babb contends that the site improvements that were initiated are set forth in his Affidavit. (Doc. 434).

■ No supporting documentation appears in the record to substantiate Babb's claim that the Debtor took possession of the property by commencing the repairs and other work necessary for use of the dock. Even if Babb had shown that the work was performed, however, he did not establish that the Debtor received any value from the improvements, since the Debtor never docked the Excalibur at the site, or operated from the premises. In determining whether an administrative expense claim should be allowed, the focus is on actual benefit to the estate, no any loss sustained by a creditor. *In re Enron Corp.*, 279 B.R. 79, 85 (Bankr.S.D.N.Y. 2002).

The Debtor did not receive any actual, concrete benefit in exchange for the Lease payments and charges claimed by Babb.

## Conclusion

Babb asserts that he is entitled to the allowance of an administrative expense claim for postpetition rent and other charges arising from the Debtor's prepetition Lease of certain property located in South Carolina.

The Court finds that there are no genuine issues of material fact, and that Babb's administrative expense claim should be disallowed as a matter of law because (1) the Lease is not a valid, enforceable agreement, and also because (2) the Debtor's estate did not receive any actual, concrete benefit as a result of the Lease.

Accordingly:

**IT IS ORDERED** that:

1. The Chapter 7 Trustee's Motion for Summary Judgment as to Malcolm M. Babb's Request for Payment of Administrative Expense is granted.

2. The Request for Payment of Administrative Expense filed by Malcolm M. Babb is denied, and the administrative expense claim of Malcolm M. Babb is disallowed.