**In re SPORTS SHINKO (FLORIDA) CO., LTD., d/b/a Grenelefe Golf and Tennis Resort, Debtor.**

**No. 8:02–BK–2804–PMG.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Sept. 28, 2005.

Herbert R. Donica, Esquire, Herbert R. Donica, P.A., Tampa, FL, for Claimant, Grenelefe Association of Condominium Owners No. 1, Inc.

Roberta A. Colton, Esquire, and Dawn A. Carapella, Esquire, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, Tampa, FL, for the Chapter 7 Trustee, Traci K. Stevenson.

## ORDER ON MOTION AND AMENDED MOTION FOR ALLOWANCE OF ADMINISTRATIVE CLAIM FILED BY GRENELEFE ASSOCIATION OF CONDOMINIUM OWNERS NO. 1, INC.

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing to consider the Motion for Allowance of an Administrative Claim, and the Amended Motion for Allowance of an Administrative Claim, filed by Grenelefe Association of Condominium Owners No. 1, Inc.

Prior to the filing of its Chapter 7 petition, the Debtor, Sports Shinko (Florida) Co., Ltd., operated a golf and tennis resort in Polk County, Florida. The Debtor's assets included 405 condominium units located on the resort's premises.

Grenelefe Association of Condominium Owners No. 1, Inc. (the Association) is a not for profit corporation organized to operate the condominiums pursuant to a Declaration of Condominium.

In the Motions under consideration, the Association seeks the allowance and payment of an administrative expense claim in the amount of $287,652.05. The claim is based on the expenditures that the Association made to maintain the condominium units and related common areas after the filing of the bankruptcy petition.

### Background

The Debtor filed its petition under Chapter 7 of the Bankruptcy Code on February 18, 2002.

At the time that the petition was filed, the Debtor's assets included three golf courses, tennis courts, banquet facilities, a wastewater treatment facility, and 405 condominium units situated on approximately 1,000 acres of real property in Polk County. Although 781 condominiums were ac-

tually situated on the premises, the Debtor owned only 405, or approximately 52 percent, of the total number of units.

Prior to the filing of the bankruptcy petition, the Debtor operated the property as the Grenelefe Golf and Tennis Resort.

Substantially all of the Debtor's assets, including its cash and receivables, were encumbered by a lien held by First Columbine Insurance Company in the principal amount of $11,512,403.87.

On February 18, 2002, the same date that the bankruptcy petition was filed, Traci Strickland Stevenson (the Trustee) was appointed as the Chapter 7 Trustee.

On February 28, 2002, the Court entered an Order Granting Interim Chapter 7 Trustee's Emergency Motion to Continue Operating. (Doc. 15). The Order authorized the Trustee to operate the Debtor's wastewater treatment facility. The authorization provided by the Order was expressly limited to the wastewater treatment facility, however, and did not extend to the recreational facilities or condominiums located at the resort.

Within a week after the filing of the petition, the Trustee had relocated all of the guests who were staying in the estate's condominium units and verified that the units were vacant, removed all of the trash and linens, turned off the air conditioners, refrigerators, water heaters, and water supply, and "locked down" the estate's condominiums. (Transcript, Vol.I, pp. 49, 111). The Trustee never rented any of the condominiums to third parties or guests of the resort. (Transcript, Vol.I, p. 49).

Charles R. Peloquin (Peloquin), the Association's General Manager, testified that the Association is required by statute and by its Declaration of Condominium to maintain and serve all of the condominium property, even if a particular unit owner has not paid the Association's quarterly fees. (Transcript, Vol.II, p. 14–16). Consequently, Peloquin testified that he approached the Trustee while the Chapter 7 case was pending, and asked her to pay the estate's share of the Association's fees. According to Peloquin:

> I made a veiled threat to Traci Strickland, as she was known then, about cutting off power, because I kept asking her for money and when were we going to be paid our fees. And as things got tighter and tighter, I had several conversations with her. And I asked her one day, I said, "Well, you know, what would you do if I just stopped paying the electric bill and the whole place went into darkness?" And she said, "Oh, please, don't do that."

> And I said, "Well, you know, I'm going to run out of money if you don't pay your part 'cause I'm only, you know, living with half my budget." And she said, "No, you can't do that." She said, "You do have an option of filing an administrative claim and getting your funds after this thing is all over, but don't say I said that."

(Transcript, Vol.II, p. 30). Peloquin interpreted the Trustee's statements as a representation that the Association would ultimately be paid if it continued to provide its regular maintenance services for all of the condominiums. (Transcript, Vol.II, p. 31).

The Trustee contends, however, that she never authorized the Association to make any expenditures for the maintenance of the condominiums. She testified that she "was not involved in the decision-making process" regarding the specific payments made by the Association, and that the particular expenses were not presented to her as they were incurred. (Transcript, Vol.I, pp. 84–87, 90–91). The Trustee acknowledged that Peloquin requested payment of the fees from her, but testified

that she only advised him to seek a court order authorizing the payment.

A few days later, he did tell me— request that, yes, we needed to pay the assessments so he could keep everything running. And I informed him he needed to get a court order because I didn't have the authority to just pay a monthly maintenance fee without a judge telling me to do it.

(Transcript, Vol.I, p. 52). Additionally, the Trustee's counsel, Roberta Colton, testified that Peloquin never sought her permission to make any specific expenditures for maintenance purposes. (Transcript, Vol. II, pp. 129, 131).

Peloquin testified that the Association spent the total sum of $553,177.01 for the maintenance of all of the condominiums during the period in which the Trustee was in control of the Debtor's property. (Transcript, Vol.II, p. 68). According to the Association, therefore, the amount of the expenditures that should be paid by the estate (52 percent of the total disbursements) equals $287,652.05.

The Association's expenditures were primarily for building insurance ($33,868.79), grounds maintenance ($150,695.60), electricity ($21,802.29), pest control ($6,071.00), roof replacement ($2,835.00), painting ($39,000.00), materials ($22,921.01), employee wages ($170,274.00), employee insurance ($50,494.03), taxes and administrative expenses ($14,517.50), and legal fees ($27,121.11).

On May 8, 2002, the Trustee filed a Motion for an Order (A) Establishing Bidding Procedures; (B) Approving Break–Up Fee and Right of First Refusal; (C) Approving the Form of Notice of Sale; and (D) Authorizing Sale of Substantially All of the Estate's Assets Free and Clear of Liens, Claims, Interests and Encumbrances. (Doc. 49).

On May 17, 2002, approximately one week after the Trustee filed its Motion regarding the sale of the property, the Association filed a Motion to Compel Payment of Assessments. (Doc. 53). In the Motion, the Association asserted that it was responsible for maintaining the condominiums, and requested the entry of an Order directing the Trustee, as the owner of 405 condominium units, to pay the assessment fees owed for the first and second quarters of 2002. The Association contended that it needed the funds to pay specific expenses incurred for insurance, electricity, lawn care, and legal fees, among other maintenance costs.

The Association's Motion to Compel Payment of Assessments was subsequently denied. (Doc. 85).

On June 27, 2002, the Court entered an Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (B) Approving a Backup Credit Bid; and (C) Establishing Procedures and Deadlines for Asserting Claims Against the Proceeds of the Sale. (Doc. 77).

In the Order, the Court approved the sale of substantially all of the Debtor's assets to Central Florida Investments, Inc. (the Buyer) for the purchase price of $12,750,000.00. The Order further provided that First Columbine would be paid the principal amount of its claim ($11,512,403.87), plus interest and late fees, at the closing of the sale.

The sale to the Buyer closed on July 1, 2002.

Thomas Dugan (Dugan), the Buyer's Chief Financial Officer, testified that the Buyer was primarily interested in the condominiums in connection with its purchase of the property, because of the potential to make a significant profit upon the renova-

tion and re-sale of the units. (Transcript, Vol.I, pp. 134–36). Dugan also testified, however, that he did not inspect the condominiums, and did not participate in the review of the property, before the Buyer made its bid. (Transcript, Vol.I, pp. 137, 143–44).

## Discussion

In its Motion and Amended Motion, the Association seeks the allowance and payment of its administrative expense claim pursuant to § 503(b) of the Bankruptcy Code. The sole issue in this case, therefore, is whether the Association's claim satisfies the standard for administrative expense status required by § 503(b).

■ Section 503(b) of the Bankruptcy Code provides in part:

**11 U.S.C. § 503. Allowance of administrative expenses**

.     .     .     .     .

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b). "The Eleventh Circuit has interpreted this Code provision to not only require 'that the expense be "actual" and "necessary," but also that there be a concrete benefit to the debtor's estate.'" *In re Atlanta Retail, Inc.*, 287 B.R. 849, 858 (Bankr.N.D.Ga.2002) (quoting *In re Beverage Canners Int'l Corp.*, 255 B.R. 89, 92 (Bankr.S.D.Fla.2000))(citing *In re Subscription Television of Greater Atlanta*, 789 F.2d 1530 (11th Cir.1986)).

■ "In order for a claim on a postpetition expense to be allowed as an administrative priority claim, an estate must ac-tually make beneficial use of any value received in exchange for the incurring of the expense." *In re Right Time Foods, Inc.*, 262 B.R. 882, 884 (Bankr.M.D.Fla. 2001).

To establish an administrative claim in this case, therefore, the Association must show that the estate received an actual, concrete benefit in exchange for the Association's expenditures.

The Court has applied this standard to the evidence, and first finds that the Association is entitled to the allowance of an administrative claim because it provided an actual and concrete benefit to the estate.

The second and more difficult question in this case, however, involves the quantification of the Association's claim. In other words, the Court must evaluate each disbursement made by the Association, and determine whether the specific payment provided an actual benefit to the estate.

## A. Benefit to the estate

■ The estate received an actual and concrete benefit from the services furnished by the Association.

The Trustee did not abandon the condominiums. On the contrary, the Trustee actively marketed the resort, including the condominiums, for sale. Roberta Colton, the Trustee's attorney, testified that the Trustee marketed the property by distributing a comprehensive packet of information about the resort to a "marketing list" that was developed through inquiries from approximately 140 potential purchasers. Colton also testified that she used interviews with trade magazines and news sources to further promote the sale of the resort. (Transcript, Vol.II, pp. 125–26).

Additionally, the Trustee states that she showed the property, including the condo-

miniums, to more than forty prospective purchasers. (Transcript, Vol. I, p. 120; Trustee's Exhibit 9). Specifically, the Trustee testified that she generally showed the property to potential buyers by using golf carts to tour the convention center, golf courses, water treatment facility, and condominiums. (Transcript, Vol.I, pp. 120–21).

The Trustee ultimately sold the property to the Buyer for the adjusted purchase price of $12,422,610.05. (Transcript, Vol.I, p. 10). First Columbine, the Debtor's primary secured creditor, received in excess of $11,512,403.87 upon the closing of the transaction. (Doc. 77). Further, on January 9, 2003, the Court entered an Order authorizing the distribution of additional amounts from the sale proceeds. (Doc. 127). Specifically, First Columbine received an additional $130,819.51, the Grenelefe Club Estates Homeowners Association, Inc. received $123,857.49, the Association received $50,000.00, and the Bank of America received $3,000.00. Finally, $450,155.55 was placed in a reserve account as a surcharge in favor of the Trustee and her professionals. (Doc. 127, p. 3).

The Trustee also received $250,000.00 as a nonrefundable deposit from an unsuccessful bidder on the property. (Transcript, Vol. I, pp. 118–19, Trustee's Exhibit 6, p. 27). It appears that the funds represented by the deposit remain available for payment of administrative claims. (Transcript, Vol.I, pp. 118–19).

Consequently, it is clear that the Trustee used the assets of the estate, including the condominiums, by aggressively marketing them and selling them in the course of administering the Chapter 7 case. It is also clear that several creditors of the estate received significant payments as a result of the sale.

This case is readily distinguishable, therefore, from those cases in which the Chapter 7 trustee did not use, operate, or sell specific property of the estate during the administration of the case. In *In re Cheatle*, 150 B.R. 266 (Bankr.D.Colo.1993), for example, the Court found that a homeowners' association's assessments did not provide an actual benefit to the estate, and that the association was not entitled to an administrative claim, after the trustee abandoned the property in which the association had an interest. The same conclusion was reached under similar circumstances in *In re Moore*, 109 B.R. 777 (Bankr.E.D.Tenn.1989). Further, in both *Cheatle* and *Moore*, the Courts indicated that the result would have been different if the trustees had used or sold the property during the bankruptcy case. *In re Cheatle*, 150 B.R. at 270; *In re Moore*, 109 B.R. at 784.

Finally, it is significant in this case that the condominiums were an integral part of the sale to the Buyer.

Thomas Dugan, the Chief Financial Officer of the Buyer, testified that the Buyer is primarily in the business of owning and selling timeshare properties. (Transcript, Vol.I, p. 134). When asked to describe the Buyer's interest in this case, Dugan testified:

A: The primary interest would be: We thought it would make a good retirement community similar to The Villages or there's another one in Poinciana that's done very well. There are about 900 units: I think we were buying about 400, along with some golf courses. And we would utilize those 400 as a condominium sale.

Q: And it was the units, the condominium units, that you were interested in?

A: Yes.

(Transcript, Vol.I, p. 134). Dugan further testified that the Buyer believed that the project's value existed in the Buyer's ability to acquire the condominiums as a "bulk" purchase. The Buyer then intended to renovate or upgrade the individual units and re-sell them at substantially increased prices. (Transcript, Vol.I, pp. 135–36).

Dugan's testimony at trial is consistent with his Affidavit dated January 13, 2004, in which he stated that (1) the condominiums were an important factor in the Buyer's bid to purchase the property; and that (2) the fair market value, condition, and maintenance of the condominiums were factored into the offer to purchase the property. (Trustee's Exhibit 19).

Since the Trustee used the condominiums by selling them in the administration of the case, and since the condominiums were an integral part of the sale, the Court finds that the Association is entitled to the allowance of an administrative claim for the amount of its postpetition expenditures that provided an actual and concrete benefit to the estate.

## B. Quantifying the benefit

■ The Court has found that the Association is entitled to the allowance of an administrative expense claim. The next issue, therefore, involves a quantification of the Association's claim. To quantify the claim, the Court must evaluate each of the specific expenditures made by the Association, and determine whether the particular expense resulted in a concrete benefit to the estate.

The decision in *In re Packard Properties, Ltd.,* 118 B.R. 61 (Bankr.N.D.Tex. 1990) is helpful in assessing the individual expenditures made by the Association. In *Packard Properties,* an association filed a claim in a Chapter 7 case for assessments relating to the maintenance and management of a planned unit development in which the debtor had been an owner.

To be allowable as an administrative expense, the Court stated, the association's expenses must be reasonable, actual, necessary, and beneficial to the estate. *In re Packard Properties,* 118 B.R. at 63. The Court then evaluated the specific expenses claimed by the association and found that certain items, such as payments for supplies and professional fees, did not benefit the estate. *Id.* at 63. The Court also found, however, that certain of the association's expenditures were entitled to administrative expense status.

> However, it appears that the categories of charges for "insurance," "utilities," "cable," "fire alarm monitoring," "landscape maintenance," and "taxes" (the second category of expenses) benefited all estate owners, including the Debtor's estate.

*Id.* at 64. It appears, therefore, that an item-by-item evaluation is appropriate to determine which specific expenses are allowable as an administrative claim under § 503(b).

■ The party asserting an administrative claim bears the burden of proving that the claim should be allowed. "The claimant has the burden of proving entitlement to an administrative expense by preponderance of the evidence." *In re Kmart Corporation,* 293 B.R. 905, 909 (Bankr. N.D.Ill.2003). "The burden of proving an entitlement to an administrative expense is on the claimant." *In re Central Idaho Forest Products,* 317 B.R. 150, 155 (Bankr.D.Idaho 2004).

The Court will therefore evaluate each category of expense claimed by the Association to determine whether the Association satisfied its burden of proof with respect to the particular payment.

## 1. Insurance

■ The Association asserts that it paid the total sum of $33,868.79 to insure the condominium buildings between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $17,611.77.

The expenditure is evidenced by four checks payable to Nationwide Insurance between May 2, 2002, and June 27, 2002. (Association's Exhibit 2.a).

Charles Peloquin testified that the insurance purchased by the Association included both property and liability insurance. According to Peloquin, the property insurance covered "the common element of the buildings, the individual property that falls within the common elements, so we are insuring the structure of the building, the walls, the roofs, the stairways, the decks." (Transcript, Vol. II, pp. 38–39). The liability insurance, of course, provided protection in the event that a person was injured on the property. (Transcript, Vol. II, p. 39).

The Trustee does not appear to contest the notion that the purchase of insurance was a necessary expenditure. She conceded that "it was necessary" to insure the project, and that the "building needed insuring." (Transcript, Vol.I, pp. 76, 93). Even though the Trustee purchased "minimum" coverage for other aspects of the resort, however, she did not clearly testify that she insured the condominiums when she took control of the resort. (Transcript, Vol.I, pp. 76–77). In fact, when questioned about property insurance on the condominium buildings, she stated:

Q: So you didn't insure the structures, did you?

A: The outside structures?

Q: Right.

A: Well, it's—no, that doesn't make sense. If there's a building that has eight units in it and one's owned by Sports Shinko, I can't insure the whole outside of that building.

Q: Is that the condominium association's responsibility?

A: It is.

Q: Okay. Would you expect them to pay for that insurance?

A: I would.

(Transcript, Vol.I, p. 78). Additionally, the Trustee testified that she did not even have an insurable interest in the condominiums' common areas, since the estate was simply the owner of individual condominium units. (Transcript, Vol.I, p. 93). Finally, the Trustee testified that she would have insured the buildings if the estate had possessed such an insurable interest in the structures. (Transcript, Vol. I, p. 122).

Insuring an asset of the estate against loss or liability is a necessary business expense. See *In re Packard Properties,* 118 B.R. at 64. The Court finds that this category of expenditure should be allowed.

The amount claimed by the Association should be reduced, however, since it appears that certain premiums paid by the Association related to automobile insurance. (Transcript, Vol. II, pp. 39, 96; Association's Exhibit 2.a). The amount of the automobile insurance was $1,227.00. The automobiles were not property of the estate.

Consequently, the portion of the Association's claim based on expenditures for insurance should be allowed in the amount of $16,973.73 ($33,868.79—$1,227.00 = $32,641.79 × 52% = $16,973.73).

## 2. Lawn care

■ The Association contends that it spent the sum of $150,695.60 to mow and trim the condominiums' grounds between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $80,077.40.

The expenditure is evidenced by five checks payable to OneSource Facility Services between April 4, 2002, and August 15, 2002. (Association's Exhibits 2.b, 4.b).

It is clear that maintenance of the Association's grounds is an extensive project. Charles Peloquin testified that the Association's property (which excludes the golf courses and other non-Association grounds) consists of approximately 200 acres of land, and that a person would drive ten miles to reach every area of the property by car. (Transcript, Vol.II, pp. 22, 25). Further, the property borders roads that are used to access the condominium units, and in some cases the property is adjacent to the golf courses. Peloquin testified that it takes a week simply to mow the property, and that maintaining the grounds is a continuous process. (Transcript, Vol.II, pp. 25–26).

The Trustee acknowledged that her work crews mowed certain areas of the lawn along the public roads, but testified that she would not have instructed her staff to mow the common areas belonging to the Association. (Transcript, Vol.I, pp. 75,96).

As set forth above, however, the Trustee was actively marketing the property during the period of the estate's ownership. She testified that she gave more than forty golf cart tours of the entire premises, including the condominiums, to prospective purchasers. (Transcript, Vol.I, p. 120). She further testified that the potential buyers were primarily interested in the golf courses and the condominiums as an indivisible package. (Transcript, Vol.I, pp. 61–62). The potential purchasers' interest is consistent with the Trustee's testimony that the value of the property existed in its ability to operate as a "destination resort." In other words, "you have to come and do something, and that is to golf. The condos are just a place to stay, they use them as

hotels, so people could golf." (Transcript, Vol.I, p. 68).

The Court finds that it was necessary to maintain the lawn and the landscaping on the premises to ensure that the property was presentable and attractive to the Buyer and to other potential purchasers, and to maintain the grounds until the property could be sold.

Even though a certain level of grounds keeping was necessary, however, it appears that the total amount spent by the Association for lawn care was not necessary for the Debtor. In order to sell the property, it was not necessary to maintain the lawn at the same level that it was maintained while the condominiums were managed as part of an operating resort.

The Association's claim is based on lawn care fees in the amount of $30,799.00 per month. Beginning in June of 2002, however, the "contract amount changed" to $15,399.00 per month. (Trustee's Exhibit 4, Bates Stamp No. 439). The Court finds that the reduced rate is evidence of a reasonable monthly charge to maintain the grounds around the condominium buildings while the property was marketed.

Consequently, the portion of the Association's claim based on lawn maintenance should be allowed in the reduced amount of **$36,033.66** ($15,399.00 × 4½ months = $69,295.50 × 52% = $36,033.66).

### 3. Lighting

■ The Association spent the sum of $21,802.29 to light the condominium buildings, parking lots, and surrounding streets between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $11,337.19.

The expenditure is evidenced by five separate checks payable to Florida Power Corporation between March 8, 2002, and July 3, 2002. (Association's Exhibit 2.c).

Charles Peloquin testified that the electricity from Florida Power was used to operate the lights on the exterior of the condominium buildings and in the parking lots, and that the lighting was "absolutely necessary" for safety. (Transcript, Vol.II, pp. 42–43). The Trustee, on the other hand, testified that she paid for only "minimal electricity," which did not include electricity to light the parking lots. (Transcript, Vol.I, p. 97).

The Court finds that it was necessary to light the condominium buildings and surrounding areas, for safety and security purposes, even though the estate's condominium units were vacant. There is no indication that the amount paid by the Association for electricity was unreasonable.

The portion of the Association's claim based on electricity to light the condominiums and surrounding areas should be allowed in the amount of **$11,337.19**.

### 4. Light bulbs

The Association contends that it spent the sum of $1,919.43 to pay for light bulbs between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $998.10.

The expenditure is evidenced by six separate checks payable to Tramco, Inc. between April 18, 2002, and August 1, 2002. (Association's Exhibit 4.d).

Charles Peloquin testified that approximately 9,000 light bulbs are required to light the common areas related to the Association's property. (Transcript, Vol.II, p. 44).

As indicated above, it is a necessary expenditure to light the buildings and surrounding areas in order to keep the premises safe and secure. The amount of the payments is not unreasonable.

The portion of the Association's claim based on the purchase of light bulbs should be allowed in the amount of $998.10.

### 5. Pest control

The Association spent the sum of $6,071.00 for pest control between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $3,156.92.

The expenditure is evidenced by four checks payable to Reliable Pest Management, Inc. between April 18, 2002, and August 1, 2002. (Association's Exhibit 2.e).

Charles Peloquin testified that the expenditure was for both interior and exterior pest control, and was necessary to eliminate roaches, ants, and other vermin that would enter the buildings. (Transcript, Vol.II, p. 44). Peloquin also testified that adequate pest control involved a health issue, and that the buildings would be subject to County Code enforcement if not properly protected. (Transcript, Vol.II, p. 45).

Under these circumstances, the Court finds that it was necessary to provide pest control to the buildings as a prudent maintenance practice. The amount paid by the Association appears to be reasonable.

The portion of the Association's claim based on pest control services should be allowed in the amount of **$3,156.92**.

### 6. Trash removal

The Association spent the sum of $5,108.22 to remove trash from the condominiums between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $2,656.27.

The expenditure is evidenced by eleven checks payable to Florida Refuse Service, Inc. between March 8, 2002, and August 1, 2002. (Association's Exhibits 2.f and 4.f).

All of the estate's condominium units were vacant and locked within a week after the Chapter 7 petition was filed. The Trustee testified that she relocated the guests that were staying in the estate's units, and verified that the units were vacant, within approximately three days after the petition was filed. (Transcript, Vol.I, pp. 111–12). She further testified that she "did not rent out any of the condominiums. We locked them all down." (Transcript, Vol.I, p. 49). Only two units were used periodically by the Trustee, and the remainder of the units were not occupied. (Transcript, Vol.I, 112).

Although Charles Peloquin testified that trash was removed from the buildings, it appears that the trash was generated by guests or tenants who were staying in units that did not belong to the estate. (Transcript, Vol.II, pp. 20, 46). Peloquin ultimately acknowledged that he "was talking about guests of the resort leaving, rental condominiums that were not owned by the Debtor but owned by individual owners." (Transcript, Vol.II, p. 111).

As the Trustee indicated, the Association would not have removed any trash from the estate's condominiums, because no trash was produced from the vacant units. (Transcript, Vol.I, p. 101).

The Association failed to satisfy its burden of proving that its expenditures for trash removal were reasonable and necessary costs of preserving the estate.

### 7. Roof replacement

On March 8, 2002, the Association spent the sum of $2,835.00 to repair and replace a roof in one of the condominium buildings. Fifty-two percent of this total is $1,474.20.

The expenditure is evidenced by a check dated March 8, 2002, and made payable to Dees Roofing. (Association's Exhibit 2.g).

Generally, it appears that the repair of a roof is necessary to prevent further damage to both the interior and exterior of the structure. In this case, Charles Peloquin testified that the roof at issue was leaking, and that it was located on a building in which all of the units were owned by the estate. (Transcript, Vol.II, p. 46). The repair and replacement was necessary to protect the sheetrock and ceilings, and to prevent the growth of mold and mildew in the building. (Transcript, Vol.II, p. 47). All of the units in the building were owned by the estate, and this was an actual and necessary expense of preserving the estate.

The portion of the Association's claim based on the repair or replacement of the roof should be allowed in the amount of $2,835.00.

### 8. Painting

The Association spent the sum of $39,000.00 to complete the painting of the exterior of the condominium buildings between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $20,280.00.

The expenditure is evidenced by six separate checks payable to Paul Painting, Inc. in the amount of $6,500 each. (Association's Exhibit 2.h). The invoices attached to the checks relate to work performed on Buildings 392, 393, 394, 395, 396, and 397, respectively.

Charles Peloquin testified that the buildings at issue were painted according to the Association's normal maintenance schedule. According to the schedule, the buildings were painted every five to six years. (Transcript, Vol.II, p. 48). Peloquin did not establish that the existing paint had surpassed its "useful life," and there is no evidence of an immediate need to paint the buildings. (Transcript, Vol.II, p. 95).

Under these circumstances, the Court finds that the disbursements made to paint the buildings were not necessary for the sale of the property.

The Association did not satisfy its burden of proving that the expenditure to paint the buildings was a reasonable and necessary expense of preserving the estate.

### 9. Maintenance supplies

■ The Association spent the sum of $22,921.01 for maintenance supplies between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $11,918.93.

The expenditure is evidenced by miscellaneous checks payable to various vendors or suppliers such as Home Depot and Texaco. (Association's Exhibits 2.i, 4.i).

Charles Peloquin testified that the supplies were needed for "ordinary maintenance." (Transcript, Vol.II, pp. 49–50.) The Association did not present any specific evidence to connect the supplies to the estate's condominiums, or to explain why they were needed to maintain the property. In fact, Peloquin appeared to acknowledge that the Association does not keep track of the supplies based on how they are used or installed on the premises. (Transcript, Vol.II, p. 103). Further, it appears from the invoices and checks that certain of the expenditures may relate to automobiles or automotive parts that would not involve property of the estate.

The Association did not satisfy its burden of proving that the expenditures for maintenance supplies were reasonable and necessary costs of preserving the estate.

### 10. Fire extinguishers

The Association spent the sum of $125.00 between February 18, 2002, and July 1, 2002, to replace fire extinguishers that had been stolen. Fifty-two percent of this total is $66.00.

The Trustee does not appear to contest the allowance of this expenditure as an administrative expense claim. (Doc. 232, p. 16).

Consequently, the portion of the Association's claim based on the replacement of fire extinguishers should be allowed in the amount of $66.00.

### 11. Telephone

■ The Association spent the sum of $2,532.79 for telephone and related services between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $1,317.05.

The expenditure is evidenced by a series of checks payable to Verizon, IDS Telcom, American Express (VoiceStream), AT & T, and MessageLink between February 27, 2002, and August 8, 2002.

Peloquin testified that the phone service was necessary in the days following the bankruptcy to respond to inquiries from guests and potential guests of the resort. (Transcript, Vol.II, p. 52). Peloquin also testified, however, that the phone service was used to respond to individual unit owners about matters unrelated to the estate, and to enable the Association's staff to communicate with each other on the Association's grounds. (Transcript, Vol.II, pp. 53–54).

It appears that this expenditure is in the nature of an overhead expense or internal "cost of doing business" incurred by the Association. No evidence was presented that the telephone charges provided an actual and concrete benefit to the estate.

The Association failed to satisfy its burden of proving that its expenditures for telephone services were reasonable and necessary costs of preserving the estate.

498

## 12. Payroll

██ The Association spent the sum of $170,274.00 to pay its employees who worked on the premises between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $88,542.48.

It appears from the documentary evidence submitted at trial that the Association employed nineteen (19) workers during the period in which the condominiums were property of the estate. (Association's Exhibit 2.1, Employer's Quarterly Federal Tax Return for June of 2002, and Payroll Registry History). It further appears that the Association retained nearly all of its employees after the bankruptcy petition was filed. (Association's Exhibit 2.1; Transcript, Vol. II, pp. 105–06).

The documentation does not clearly identify the job position or specific duties of the employees. The time sheets submitted for one employee, however, indicate that the majority of her time was devoted to dealing with individual condominium owners. (Association's Exhibit 2.1, Time Sheets of Karen Reed). In fact, the employee's function was to "be there for the owners," which did not involve any tasks related to the estate's units during the period of the bankruptcy. (Transcript, Vol. II, pp. 107–08).

The Trustee relocated the residents of the estate's condominium units within a week after the bankruptcy petition was filed, and the units remained vacant, with very few exceptions, until the property was sold. To the extent that the efforts of the Association's employees involved meeting with residents, therefore, it appears that they were performing services related to condominiums that were not property of the estate.

Additionally, to the extent that lawn care, pest control, and similar services were provided to units belonging to the estate, the Association hired independent companies to perform the work. It did not use its own employees for all of the maintenance at the resort.

The Association has not justified the employment of nineteen people to service the vacant condominium units. It did not satisfy its burden of proving that its expenditures for payroll were reasonable and necessary costs of preserving the estate.

## 13. Employee benefits

The Association spent the sum of $50,494.03 for workers' compensation and health and disability insurance for its employees between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $26,256.90.

For the reasons stated in the discussion regarding payroll, the Association's claim relating to employee benefits should be disallowed. The Association failed to justify its payroll expenses as a reasonable and necessary cost of preserving the estate.

## 14. Employee uniforms

The Association spent the sum of $3,891.24 to pay for uniforms for its employees. Fifty-two percent of this total is $2,023.44.

For the reasons stated in the discussion regarding payroll, the Association's claim relating to employee uniforms should be disallowed. The Association failed to justify its employee expenses as a reasonable and necessary cost of preserving the estate.

## 15. Local taxes and administrative expenses

██ The Association asserts that it spent the sum of $14,517.50 on local taxes and administrative expenses between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $7,549.10.

The expenditures are evidenced by a series of checks payable to suppliers and vendors for office products and services. (Association's Exhibits 2.o, 4.o).

Significantly, however, the expenditures in this category also include checks payable to the Tax Collector for vehicle registrations, to First National Bank as a loan payment, and to an accountant for professional services. (Association's Exhibits 2.o, 4.o).

These expenses do not directly relate to the estate's condominium units. Charles Peloquin, for example, testified as follows regarding this category of disbursements:

Q: So except for the tax, is this general office administration?

A: Pretty much, yeah, it looks that way.

Q: Okay.

A: Also—well, it also includes payment to professional fees to our auditors or our accountants. It also includes printing, it includes some computer technical services that we had to pay to keep our computers operating. It includes purchase of envelopes and invoices, printed invoices.

Q: So is this just general administration that's incurred?

A: Yeah. It's all general stuff.

Q: In the operation of the association, is that correct?

A: Right, yeah.

(Transcript, Vol.II, p. 60). The evidence does not show a clear connection between the Association's general office expenses and the condominiums owned by the estate.

The Association failed to satisfy its burden of proving that this category of expenditure provided an actual and concrete benefit to the estate. *In re Packard Properties,* 118 B.R. at 63. The portion of the Association's claim for "local taxes and ad-ministrative expenses" should be disallowed.

### 16. Legal fees

■ The Association paid the sum of $27,121.11 to its general counsel, Shepard, Filburn & Goldblatt, P.A. (the Law Firm), between February 18, 2002, and July 1, 2002. Fifty-two percent of this total is $14,102.98.

The expenditure is evidenced by the statements of the Law Firm, and the checks issued to the Firm in payment of the statements. (Association's Exhibit 2.p).

■ Generally, a creditor's legal fees are not allowable as an administrative expense claim unless the creditor can demonstrate that the legal services provided a benefit to the estate. *In re Keene Corporation,* 208 B.R. 112, 115–16 (Bankr. S.D.N.Y.1997); *In re Mishkin,* 85 B.R. 18, 22 (Bankr.S.D.N.Y.1988).

The Law Firm handled "all of [the Association's] legal work, whatever it may involve, from lawsuits to collections to interpretation of law, statutes and things of this nature, legal advice that we may get." (Transcript, Vol.II, p. 61).

In this case, the Law Firm's statements reflect that many of its services involved litigation and issues that were unrelated to the bankruptcy case. Considerable work was performed, for example, in an apparent state court matter that was referred to as *"Grenelefe v. Hobbs."* Peloquin testified that the litigation involved a "disgruntled owner's" claim against the Association based on the Association's alleged failure to comply with the Declarations of Condominium and Florida law. (Transcript, Vol. II, pp. 61, 109).

Other services, such as attendance at Board meetings, appear to reflect the Law

Firm's normal responsibilities as counsel for the Association.

Finally, even as to those tasks that involve the Chapter 7 case, it is clear that the Law Firm's services are directed to the protection of the Association's interest. According to Charles Peloquin, the services were related to the Association's assertion of a claim as a creditor of the estate. (Transcript, Vol.II, p. 110). When the law firm prepared the Motion to compel the estate to pay the Association's assessments, for example, it was working for the benefit of the Association, and not the bankruptcy estate.

The Association did not satisfy its burden of proving that the expenditure for legal fees was a reasonable and necessary expense of preserving the estate. The portion of the Association's claim based on payment of its legal fees should be disallowed.

## C. A transaction with the estate

The Court has found that the Association's expenditures for insurance, lawn care, lighting, pest control, roof repair, and fire extinguishers provided an actual and concrete benefit to the estate.

The Trustee asserts, however, that the Association's Motion for Allowance of Administrative Claim should be denied in its entirety, because the Association's claims did not arise from a transaction with the bankruptcy estate. (Doc. 232, p. 7). The Court is not persuaded by the Trustee's position in this regard.

■ "In order to qualify a claim for payment as an administrative expense a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (*or alternatively that the claimant gave consideration to the debtor-in-possession*); and (2) directly and substantially

benefited the estate." *In re Five Star Partners, L.P.*, 193 B.R. 603, 613 (Bankr.N.D.Ga.1996)(quoting *In re United Trucking Service, Inc.*, 851 F.2d 159, 161–62 (6th Cir.1988))(Emphasis supplied).

■ "An administrative expense claimant has the burden of proving that either the debtor-in-possession incurred the transaction on which the claim is based *or that the claimant furnished consideration to the debtor-in-possession* and that the transaction resulted in a direct benefit to the debtor-in-possession." *In re Section 20 Land Group, Ltd.*, 261 B.R. 711, 716 (Bankr.M.D.Fla.2000)(Emphasis supplied). See also *In re D.M. Kaye & Sons Transport, Inc.*, 259 B.R. 114, 120 (Bankr.D.S.C. 2001) and *In re Southern Soya Corporation*, 251 B.R. 302, 308 (Bankr.D.S.C.2000).

■ A key purpose of the rule is to ensure that the benefit was provided to the *postpetition* estate, in contrast to the *prepetition* debtor. "The claimant must show that an expense is derived from a transaction with the bankruptcy estate, *as opposed to any preceding entity*, and that it directly and substantially benefited the estate. Administrative expense status is only granted for liabilities that arise post petition." *In re Pugh Shows, Inc.*, 307 B.R. 50, 57 (Bankr.S.D.Ohio 2004)(Emphasis supplied). See also *In re Visi–Trak, Inc.*, 266 B.R. 372, 375 (Bankr.N.D.Ohio 2001).

■ In this case, the Court finds that the Association provided an actual and concrete benefit to the postpetition estate by virtue of its expenditures for insurance, lawn care, lighting, pest control, roof repair, and fire extinguishers. The benefit included the maintenance and security of the condominiums while the Trustee was marketing the property and showing the resort to potential buyers. The property was ultimately sold for the purchase price

of $12,422,610.05. The Association furnished consideration to the Trustee or the Chapter 7 estate, as opposed to the prepetition Debtor, as a result of the specific disbursements described above.

Further, it is clear that the Trustee was aware of the services performed by the Association. (Transcript, Vol.I, pp. 51, 83). During the four and one-half months between February 18, 2002, and July 1, 2002, the Trustee visited the property frequently for meetings and to "tour the grounds," often as part of her marketing efforts to prospective purchasers. (Trustee's Exhibit 9). In fact, she personally gave more than forty tours of the property, including the condominiums, to potential buyers. (Transcript, Vol.I, p. 120). Her time records filed with her Application for Compensation reveal that such trips to the property were often day-long visits, or longer, and that she generally dealt with security and maintenance issues during the trips to the site. (Trustee's Exhibit 9).

The Trustee's visits to the property occurred at the same time that the Association was providing the lawn care services and other maintenance programs for the condominiums. Despite her apparent knowledge of the ongoing maintenance activities and her acknowledged status as a "majority owner" of the condominiums, however, there is no evidence that the Trustee directed the Association to terminate its upkeep of the units. Instead, the Trustee testified only that she was not involved in the decision-making, and that the specific expenses were not presented to her as they were incurred. (Transcript, Vol.I, pp. 51, 84–87, 90–91). Essentially, therefore, the Association was allowed to continue its normal maintenance schedule for more than four months, without instruction from the Trustee, even though she was aware of its activity.

Under these circumstances, the Court finds that the Association's expenditures for insurance, lawn care, lighting, pest control, roof repairs, and fire extinguishers resulted from a transaction with the estate within the meaning of § 503(b)(1) of the Bankruptcy Code.

**D. Effect of the condominium documents**

Finally, the Association contends that its entire claim should be allowed as an administrative expense, because the Declaration of Condominium imposed a duty on the Association to maintain the condominiums, and the covenants set forth in the Declaration "run with the land." (Doc. 233).

None of the cases cited by the Association relate to requests for administrative expense status under § 503(b)(1). *In re Eno*, 269 B.R. 319 (Bankr.M.D.Pa.2001), for example, involved the dischargeability of postpetition assessments; *In re Rivera*, 256 B.R. 828 (Bankr.M.D.Fla.2000) involved a motion by a homeowners' association to compel a chapter 7 debtor to "reaffirm" postpetition assessments or to surrender the property; and *In re Raymond*, 129 B.R. 354 (Bankr.S.D.N.Y.1991) involved a debtor's motion to prohibit an association from collecting postpetition assessments.

The cases do not address § 503(b) of the Bankruptcy Code, and do not hold that all of an association's postpetition expenditures should be entitled to allowance as an administrative expense claim solely because the expenses were incurred pursuant to the association's obligations under a Declaration of Condominium.

The proper analysis under § 503(b) focuses on whether the claimant's expenses produced an actual and concrete benefit to the estate. The inquiry is not whether the expenses enabled the association to per-

form its duties under applicable condominium documents. *In re Butcher*, 108 B.R. 634, 638 (Bankr.E.D.Tenn.1989).

The existence of the covenants in the condominium documents do not compel the conclusion that the Association's disbursements were necessary and beneficial to the bankruptcy estate and therefore entitled to administrative expense status.

### Conclusion

The Association seeks the allowance of an administrative expense claim in the amount of $287,652.05, based on the post-petition expenditures that the Association made to maintain property owned by the Chapter 7 Trustee.

The Court finds that the Association is entitled to administrative expense status for a portion of its claim, because certain of its expenditures provided an actual and concrete benefit to the estate in connection with the Trustee's sale of the estate's property. Specifically, the Association's reasonable expenditures for insurance, lawn care, lighting, pest control, roof repair, and fire extinguishers should be allowed as an administrative expense claim in the total amount of $71,400.60 ($16,973.73 + $36,033.66 + $11,337.19 + $998.10 + $3,156.92 + $2,835.00 + $66.00).

The balance of the Association's claim should be disallowed as a claim under § 503(b), since the Association did not satisfy its burden of proving that the disbursements were reasonable and necessary costs of preserving the estate.

Accordingly:

**IT IS ORDERED** that:

1. The Motion for Allowance of Administrative Claim, and the Amended Motion for Allowance of an Administrative Claim, filed by Grenelefe Association of Condominium Owners No. 1, Inc., are granted in part and denied in part as set forth in this Order.

2. The claim of Grenelefe Association of Condominium Owners No. 1, Inc. is allowed as an administrative expense claim under § 503(b)(1) of the Bankruptcy Code in the amount of **$71,400.60**.

3. The balance of the claim of Grenelefe Association of Condominium Owners No. 1, Inc. is disallowed as an administrative expense claim.